# ATTACHMENT 1

**AGREEMENT**

**TO RESOLVE THE DEPARTMENT OF JUSTICE'S INVESTIGATION OF**

**HAMPTON ROADS REGIONAL JAIL**

I.   INTRODUCTION ........................................................................................... 1

II.  DEFINITIONS ................................................................................................ 2

III. SUBSTANTIVE PROVISIONS ..................................................................... 3

    Policies and Procedures ................................................................................. 3

    Staffing Plan .................................................................................................. 4

    Training .......................................................................................................... 4

    Security ........................................................................................................... 4

    Medical and Mental Health Care ................................................................... 4

    Medical Care .................................................................................................. 5

    Mental Health Care ........................................................................................ 8

    Housing for Prisoners with Serious Mental Illness ..................................... 16

    Restrictive Housing ..................................................................................... 17

    Quality Assurance ....................................................................................... 19

IV. MONITOR ................................................................................................... 22

V.  IMPLEMENTATION .................................................................................. 25

VI. ENFORCEMENT ......................................................................................... 26

VII. TERMINATION .......................................................................................... 27

VIII. GENERAL PROVISIONS .......................................................................... 28

# I. INTRODUCTION

1.      This matter involves the medical and mental health care that the Hampton Roads Regional Jail Authority ("HRRJ" or "Jail" or "Regional Jail") provides to prisoners, HRRJ's use of restrictive housing for prisoners with serious mental illness ("SMI"), and HRRJ's provision of services, programs, and activities to prisoners with mental health disabilities.

2.      In 2016, the United States initiated an investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131.  The investigation focused on HRRJ's provision of medical and mental health care, its use of restrictive housing for prisoners who had mental illnesses, and its provision of access to services, programs, and activities to prisoners with mental health disabilities.

3.      On December 19, 2018, the United States issued a CRIPA Notice to HRRJ, concluding that there is reasonable cause to believe that conditions at HRRJ violate the Eighth and Fourteenth Amendments of the U.S. Constitution through HRRJ's failure to provide adequate medical and mental health care to prisoners and its placement of prisoners with serious mental illness in restrictive housing for prolonged periods of time.  The United States concluded that these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth and Fourteenth Amendments.  The United States also determined there is reasonable cause to believe that HRRJ violates the ADA by denying prisoners with mental health disabilities access to services, programs, and activities because of their disabilities.

4.      HRRJ and the United States ("the Parties") are committed to remedying the conditions identified in the CRIPA Notice and achieving compliance with Title II of the ADA.  The purpose of this Agreement is to ensure the conditions at HRRJ respect the rights of prisoners confined there.  By ensuring that the conditions at HRRJ meet the Jail's constitutional and statutory requirements, HRRJ will also provide for greater staff safety and promote public safety in the communities it serves.  This Agreement has the following goals: (1) ensure that appropriate medical and mental health care are provided to prisoners at HRRJ; (2) ensure that restrictive housing is used appropriately with respect to prisoners with serious mental illnesses; and (3) ensure that prisoners with mental health disabilities are given non-discriminatory access to the Jail's services, programs, and activities.

5.      In order to resolve the issues pending between the Parties without the expense, risks, delays, and uncertainties of litigation, the Parties agree to the terms of this Agreement as stated below.  This Agreement resolves the United States' investigation of HRRJ's alleged constitutional and ADA violations.  The Parties agree that this Agreement does not constitute an admission by Hampton Roads Regional Jail Authority of the truth of any of the conclusions contained in the United States' December 19, 2018 CRIPA Notice.

6.      The Parties stipulate that this Agreement complies in all respects with the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).  The Parties stipulate that the requirements of this Agreement are narrowly drawn, extend no further than necessary to correct the violations of federal rights as alleged by the United States in its Complaint and CRIPA Notice, are the least intrusive means necessary to correct these alleged violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  The Parties further stipulate that this Agreement is structured to ensure that it terminates upon HRRJ's showing that it has achieved durable

compliance and the injuries caused by the alleged violations identified in the CRIPA Notice have been fully remedied.

7.      This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action.  Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

## II. DEFINITIONS

8.      **Effective Date** refers to the date when this Agreement is approved by the Court.

9.      **Extraordinary Circumstances** refers to circumstances when a prisoner is too dangerous to be in any type of mental health unit and is characterized by recent and consistent acts of violence or consistent verbalization of violent intentions.

10.     **Feeder Jails** refer to the five jails that comprise the Hampton Roads Regional Jail Board. At the time of Agreement execution, those jails are Newport News Jail, Hampton Jail, Norfolk City Jail, Portsmouth City Jail, and Chesapeake City Jail.  If the Board adds or removes a jail, this definition will automatically include the addition or exclude the removal.

11.     **Hampton Roads Regional Jail ("HRRJ") or "Jail" or "Regional Jail"** refers to all existing jail facilities operated by the Hampton Roads Regional Jail Authority, as well as any other facilities built, leased, or otherwise used to house the population committed to the Hampton Roads Regional Jail Authority.

12.     **Implementation Plan** refers to a document that enumerates the tasks the Jail will undertake to fulfill its obligations under this Agreement and includes deadlines and responsible individuals for each task.

13.     **Medical Provider** refers to a physician, physician assistant, or nurse practitioner.

14.     **Mental Health Professional** refers to an individual with a minimum of a masters level education and training in social work; who has received instruction and supervision in identifying and interacting with individuals in need of mental health services; and who has earned 1,500 of the supervised hours required for a licensed clinical social worker within the previous three years. It may also refer to an individual working towards becoming a licensed professional counselor who has received instruction and supervision in identifying and interacting with individuals in need of mental health services and has earned 1,700 of the supervised hours required for a licensed professional counselor within the previous four years.

15.     **Monitor** is an individual chosen by the Parties with expertise in correctional medical and mental health care.  This individual will assess and report on whether the provisions of this Agreement have been implemented and provide technical assistance to the Jail as set forth in the Agreement.

16.     **Qualified Mental Health Professional** refers to an individual with a minimum of a masters level education and training in psychiatry, psychology, social work, or psychiatric nursing; who has received instruction and supervision in identifying and interacting with individuals in need of mental health services; and is currently licensed by the Commonwealth of Virginia to deliver those mental health services he or she has undertaken to provide.  For social workers, the

individual must be a licensed clinical social worker.  For professional counselors, the individual must be a licensed professional counselor.

17.    **Restrictive Housing** is the removal from the general prisoner population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.

18.    **Serious Mental Illness ("SMI")** is a mental, behavioral, or emotional disorder of mood, thought, or anxiety that significantly impairs:  judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life.  Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other Psychotic Disorders, Bipolar Related Disorders, and Major Depressive Disorders.

### III. SUBSTANTIVE PROVISIONS

**POLICIES AND PROCEDURES**

19.    **Policies and Procedures:**  Within six months of the Effective Date, the Jail will consult with the Monitor to draft and/or revise policies and procedures to incorporate and align them with the provisions in this Agreement.

20.    Within one year of the Effective Date, all policies and procedures that needed to be drafted and/or revised to incorporate and align them with the provisions in this Agreement will be adopted by the Jail.  The Jail will consult with the Monitor to prioritize policies and procedures to accomplish the timeframes in this Agreement (e.g., Paragraph 100).

   a.    Prior to adoption, the Jail will provide a copy of the policy or procedure to the United States for review, comment, and approval.  The United States will not unreasonably refuse to approve submitted policies or procedures. The Jail will address all comments or make any changes requested by the United States within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States for review and approval.

21.    No later than three months after the United States' approval of each policy and procedure (except as otherwise stated in the Agreement), the Jail will adopt and begin implementing the policy and procedure, which requires modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

22.    Unless otherwise agreed to by the Parties, all new or revised policies and procedures that were changed or created to align with this Agreement will be fully implemented (including completing all staff training) within six months of the United States' approval of the policy or procedure (except as otherwise stated in the Agreement).

23.    The Jail will annually review its policies and procedures, revising them as necessary.  Any revisions to the policies and procedures will be submitted to the United States for approval in accordance with Paragraph 20.a above.

STAFFING PLAN

24. **Staffing Plan Development:**  Within four months of the Effective Date, and annually thereafter, the Jail will submit to the Monitor and the United States a staffing plan for security, medical, and mental health staff adequate to achieve compliance with this Agreement on the timelines set out in this Agreement.  Each staffing plan shall be subject to review and approval by the United States, which approval shall not be unreasonably withheld.

25. **Staffing Plan Implementation:**  The Jail will staff the facility based on each staffing plan within one fiscal year of the completion of each staffing plan.

TRAINING

26. **Training:**  The Jail will provide pre-service and annual in-service training, using competency-based adult learning techniques, to security, medical, and mental health staff on new policies, mental health care and suicide prevention, and de-escalation techniques.

27. Within six months of the Effective Date, the Jail will incorporate any relevant Agreement requirements and any recommendations from the Monitor into its annual training plan that indicates the type and length of training and a schedule indicating which staff will be trained at which times.

28. The annual in-service training will ensure that all current security, medical, and mental health staff are trained within six months after new policies have been approved by the United States, with all training completed no later than 18 months after the Effective Date.  New staff will receive this training as part of pre-service training.

29. Training on mental health care, suicide prevention, and de-escalation techniques will be provided by trainers with contemporary evidence-based standards on these issues.

SECURITY

30. **Security Staffing:**  The Jail will increase security staffing to ensure that there are sufficient staff to escort medical staff during pill pass and during any visits to prisoners in restrictive housing, escort prisoners to the medical clinics for their appointments, transport prisoners to outside medical appointments, and maintain security watch over hospitalized prisoners.

MEDICAL AND MENTAL HEALTH CARE

31. **Medical and Mental Health Prior Records:**  The Jail will ensure that all reasonable efforts are made to obtain a prisoner's medical and mental health records from the most recent admission to the referring Feeder Jail, and when possible from other previous jail admissions or from community providers such as the Community Services Boards.

32. The Jail will ensure that medical and mental health records from a Feeder Jail are provided to the Regional Jail upon admission of the prisoner to the Regional Jail. The Regional Jail will ensure that pertinent information is incorporated into prisoners' medical and mental health charts.

33.     **Continue Medications**:  The Jail will ensure that prisoners entering the Jail continue to receive, without delay, prescribed medications or acceptable alternate medications, unless the Jail physician makes and documents an alternative clinical judgment.

34.     **Medical or Mental Health Request/Sick Call Process:**  The Jail will ensure that the sick call process provides prisoners with adequate access to medical and mental health care. This process will include:

35.     Collection: a confidential collection method in which designated staff members collect sick call requests every day to ensure they are triaged.

36.     Triage:  a Registered Nurse, psychiatrically trained, triages the sick call requests based upon the seriousness of the medical or mental health issue as described below in Medical and Mental Health Assessments:  Emergent; Urgent; or Routine.  The Jail will ensure that medical or mental health requests submitted in the form of a grievance or through another mechanism are appropriately triaged, even if submitted through improper channels.

37.     Tracking: a logging and tracking system that includes the date the prisoner was examined and treated by the Medical Provider (which includes psychiatrists and psychiatric nurse practitioners) if it was clinically appropriate for the prisoner to be treated by a Medical Provider. This tracking will be regularly audited to ensure compliance with this process.

38.     Sick Call Oversight: a sick call oversight system, periodically reviewed by physicians, with nursing protocols and clinical assessment forms that guide the nurses performing sick call.

**MEDICAL CARE**

39.     The Jail will provide constitutionally adequate medical care.

40.     **Medical Staffing:**  To meet the requirements of this Agreement and ensure that prisoners receive constitutionally adequate medical care, the Jail will increase medical staffing by hiring sufficient additional staff with appropriate credentials (*e.g.*, MDs, RNs, and LPNs) and increasing the hours that current staff with higher credentials are onsite on evenings and weekends.

41.     **Medical Intake:**  The Jail's medical intake may take place as part of the Jail's general initial intake screening.  The Jail will ensure that the medical screening aspect is completed within four hours of admission, or as soon as practicable if there are a large number of prisoners being processed through intake, by a Registered Nurse in a confidential setting, fully documented and available to medical staff in each prisoner's file as soon as possible.

42.     Medical screening factors: The Jail will ensure that the Registered Nurse utilizes an appropriate medical intake screening instrument to identify and record observable and non-observable medical issues, and seek the prisoner's cooperation to provide information, regarding:

   a.  medical, surgical, and mental health history, including current or recent medications;

5

b.  current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

c.  history of substance abuse and treatment;

d.  substances ingested in the past 24 hours (drugs, alcohol, *etc.*);

e.  pregnancy; and

f.  history and symptoms of communicable disease.

43. **Medical Assessments:**  In order to provide prisoners timely access to a physician as is clinically appropriate, the Jail will refer prisoners for medical assessments based on the results of the medical intake or sick call process set forth above and in accordance with the following:

44.  Emergent Medical Assessments:  The Medical Director and Director of Nursing will develop protocols identifying potentially life-threatening medical emergencies that require immediate consultation with a physician or immediate transfer to a hospital emergency room.

a.  These protocols will include, but are not limited to:  Hypertensive emergencies, Cardiac emergencies, Diabetic emergencies (Hyperglycemia and Hypoglycemia), Alcohol and Drug Overdose/Detoxification emergencies, Acute Severe Asthma, Status Epilepticus, and Acute Psychosis.

b.  The Medical Director and Director of Nursing will develop nursing protocols to identify prisoners requiring these Emergent Medical Referrals.

45.  Urgent Medical Assessments:  A medical assessment will be provided by a Medical Provider within a working shift (which as of the Effective Date of this Agreement is 12 hours) for each prisoner whose medical intake or sick call process triggers the factors below.  These prisoners must be placed in a setting with adequate monitoring pending the assessment, and the assessment itself will take place in the clinic.

a.  The factors are:  uncontrolled hypertension, uncontrolled diabetes mellitus, heart failure, poorly controlled epilepsy, poorly controlled asthma, alcohol and drug withdrawal, prisoners receiving dialysis, and prisoners with unstable psychiatric syndromes.

46.  Routine Medical Assessments (Intake):  For all other prisoners, the Jail will ensure that comprehensive health assessments of all prisoners are conducted within 14 calendar days of entering the facility, which will include a complete medical history, physical examination, current medications (amount, frequency and time of last dosage), mental health history, and current mental health status. The physical will be conducted by a Medical Provider or a Registered Nurse, as long as the Registered Nurse is trained on medical assessment intake by a physician and the medical record documenting the physical is reviewed and signed-off by a physician.  Records documenting the assessment and results will become part of each prisoner's medical record.

6

47. Routine Medical Assessments (Sick Call):  For all other prisoners, whose sick call process does not trigger an emergent or urgent response, but does require a medical assessment by a Medical Provider, that medical assessment shall take place within 72 hours of the sick call request.

48. **Acute Care:**  The Jail will address serious acute medical needs of prisoners immediately upon notification by the prisoner or HRRJ staff, providing acute care for those prisoners by a Medical Provider.

49. **Chronic Care:**  The Jail will ensure that prisoners with chronic conditions, including, but not limited to, HIV, hypertension, diabetes, asthma, and elevated blood lipids, are examined by a Medical Provider within 14 calendar days of admission, or sooner based on the Medical Intake, to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

50. Chronic Care Registry:  The Jail will maintain a chronic care registry that identifies all prisoners receiving chronic care, the diagnosis, the date of their last visit with a physician, and the date of their next visit.

51. Chronic Care Plan of Care:  The Jail will ensure that a Medical Provider develops a chronic care plan of care for each prisoner with a chronic condition at the time of the initial chronic care visit.

52. Chronic Care Protocol:  Within 90 days of the Effective Date, the Medical Director will develop a chronic care protocol.  The Jail will follow a chronic care protocol requiring Medical Providers to clinically evaluate prisoners regularly and a Chronic Care Coordinator to monitor chronic care prisoners regularly and order a follow-up visit based upon the prisoner's status at the time of the evaluation, but no later than 90 calendar days from the initial clinical evaluation.  For example, each prisoner should be assessed, according to the protocol, as to whether his/her condition is "poor," "fair," or "good."  If his/her condition is "poor" or "fair," then a follow-up visit should occur sooner than 90 calendar days as directed by the protocol.

53. **Medical Diagnoses:**  The Jail will ensure that prisoners are provided with diagnoses for identified medical problems and problem lists are developed and updated in prisoners' medical charts.

54. **Medical Specialist Appointments:**   The Jail will ensure timely medical specialist appointments, as outlined below, including those scheduled outside of the Jail.

55. Medical Specialist Registry:  The Jail will maintain a specialty appointment registry that identifies all prisoners recommended for a specialist within or outside the Jail, the specialty to which they are being referred, the date of referral, whether the referral was approved or denied by the medical contractor, the date the appointment is scheduled to occur, and the date the appointment was completed.  Urgent specialty consultations will occur within 14 calendar days and routine specialty consultations will occur within 45 calendar days, or as soon as the appointment is available beyond the 14 and 45 calendar day requirements.  Any further requested follow-up appointments will be entered as new specialty requests on this registry.  The medical director will review this registry on a weekly basis to ensure that delays in care are addressed promptly, with documented actions.

56. **Medical Follow-Up Care:**  The Jail will ensure that prisoners who receive specialty, emergency room, or hospital care are examined and evaluated by a Registered Nurse upon their return to the Jail and that the Registered Nurse reviews all accompanying documentation available from the visit before the prisoner is returned to his/her housing unit.  This review and the outside provider's documentation will be recorded in the prisoner's medical record, and appropriate follow-up, including referrals to a Medical Provider, will be scheduled.

57. **Medical Treatment Plans:**  The Jail will develop and implement appropriate treatment plans that track active problems.

58. **Medical Treatment:**  The Jail will ensure that prisoners receive treatment that adequately addresses their serious medical needs in a timely and appropriate manner.

### MENTAL HEALTH CARE

59. The Jail will provide constitutionally adequate mental health care and suicide prevention practices.

60. **Mental Health Staffing:**  To meet the requirements of this Agreement and ensure that prisoners receive constitutionally adequate mental health care, the Jail will increase mental health staffing by hiring sufficient additional staff with appropriate credentials, including psychiatrists, psychiatric nurse practitioners, and psychiatry support staff, and increasing the hours that current staff with higher credentials are onsite on evenings and weekends.

61. **Mental Health Intake:**  The Jail's mental health intake may take place as part of the Jail's general initial intake screening.  The Jail will ensure that the mental health screening aspect is completed within four hours of admission, or as soon as practicable if there are a large number of prisoners being processed through intake, by a Qualified Mental Health Professional to identify mental health issues, in a confidential setting.  The mental health intake will be fully documented and available to mental health staff in each prisoner's file as soon as possible.

62. Mental health screening factors:  The Jail will ensure that the Qualified Mental Health Professional utilizes an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health issues, and seeks the prisoner's cooperation to provide information, regarding:

   a. past suicidal ideation or attempt(s);

   b. current suicidal ideation, threat, or plan;

   c. history of mental illness and treatment, including medication and hospitalization;

   d. recent significant loss such as the death of a family member or close friend;

   e. history of suicidal behavior by family members or close friends;

   f. suicide risk during any prior confinement;

   g. any observations by the transporting officer, court, transferring agency, or similar individuals regarding the prisoner's potential suicidal risk or mental health;

    h.  substance(s) or medication(s) used, including the amount, time of last use, and history of use;

    i.  any physical observations, such as shaking, seizing, or hallucinating;

    j.  history of drug withdrawal symptoms, such as agitation, tremors, seizures, hallucinations, or delirium tremens; and

    k.  history or serious risk of delirium, depression, mania, or psychosis.

63.  **Mental Health Assessments:**  In order to provide prisoners timely access to a Qualified Mental Health Professional as is clinically appropriate, the Jail will refer prisoners for mental health assessments based on the results of the mental health intake or sick call process set forth above and in accordance with the following:

  64.  Emergent Mental Health Assessments:  The Mental Health Director and lead psychiatrist will develop protocols identifying potentially life-threatening mental health emergencies that require immediate consultation with a Qualified Mental Health Professional or referrals to a Community Services Board for a Temporary Detention Order or transfer to a hospital emergency room.

    a.  These protocols will include, but are not limited to:  prisoners who report any suicidal ideation or intent, or who attempt to harm themselves; prisoners about whom the transporting officer reports a threat or attempt to harm themselves; or prisoners who are so psychotic they are at imminent risk of harming themselves.

  65.  Urgent Mental Health Assessments:  A mental health assessment will be provided by a Qualified Mental Health Professional within a working shift (which as of the Effective Date of this Agreement is 12 hours) for each prisoner whose mental health intake or sick call process includes one of the factors below.  Note that on weekends, the timeframe may be within 16 hours to account for overnight.  These prisoners will be placed in a setting with adequate monitoring pending the assessment and the assessment itself will take place in a private, confidential space.

    a.  signs and symptoms of acute mental illness;

    b.  disorientation/confusion;

    c.  inability to respond to basic requests or give basic information; or

    d.  suicide attempt within the past 30 days.

  66.  Routine Mental Health Assessments (Intake):  A mental health assessment will be provided by a Mental Health Professional within 72 hours for each prisoner whose mental health intake includes one of the following factors:

    a.  a request to see mental health

    b.  jail history of placement on mental health units

    c.  past suicide attempt;

    d.  suicidal ideation, with intent or plan within the past 30 days; or

    e.  a combination of the following:

1. suicidal ideations within the past year, with or without intent or plan;

2. suicidal gestures within the last year;

3. a diagnosis of one or more of the following: bipolar disorder, major depression with or without psychotic features, schizophrenia, schizoaffective disorder, any diagnosis within the pervasive developmental disorder spectrum, and any other factor(s) contributing to suicide risk (*e.g.*, recent loss, family history, *etc.*).

67.    14-Day Mental Health Check-in Following Intake: All prisoners who were not assigned to the mental health caseload following intake, will be briefly screened by a Mental Health Professional within 14 days of intake to identify any mental health issues that could have developed since intake. The Mental Health Director and lead psychiatrist will develop protocols to implement this provision.

68.    Routine Mental Health Assessments (Sick Call):   All other prisoners who are identified as needing a mental health assessment through the sick call process but do not require an Emergent or Urgent assessment will receive a mental health assessment conducted by a Mental Health Professional within 5 calendar days.

69.    Nature of Mental Health Assessment:   Mental health assessments will include a structured, face-to-face interview with inquiries into the following:

a. a history of psychiatric hospitalization, psychotropic medication, and outpatient treatment; suicidal behavior; violent behavior; victimization; special education treatment; cerebral trauma or seizures; and sex offenses;

b. the current status of mental health symptoms and psychotropic medications; suicidal ideation; drug or alcohol abuse; and orientation to person, place, and time;

c. psychosocial stressors (*e.g.*, recent significant loss such as the death of a family member or close friend);

d. emotional response to incarceration; and

e. intellectual functioning (*e.g.*, intellectual disability, developmental disability, learning disability).

70.    **Mental Health Treatment Plans:** The Jail will ensure that appropriate, individualized treatment plans are developed for prisoners with mental health needs.

71.    Timing for initial treatment plan:   Within 14 calendar days of a prisoner's mental health assessment, a Mental Health Professional will develop a mental health treatment plan for prisoners with mental health needs. A Qualified Mental Health Professional must approve the plan.

72.    For prisoners with serious mental illness, within 30 calendar days of a prisoner's mental health assessment, a multidisciplinary team will update the prisoner's mental health treatment plan. This multidisciplinary team will include a Mental Health Professional, a security staff member, and when applicable, a substance use staff member. For prisoners on medications prescribed by a psychiatrist or psychiatric nurse practitioner, a psychiatrist or psychiatric nurse practitioner and a

nurse must be a part of the multidisciplinary team. When possible, the Jail will include a community mental health provider representative in the development of the plan and inform that representative of the plan during the discharge process, and will document its efforts to do so. A Qualified Mental Health Professional must approve the plan. This process is required for prisoners newly admitted to the Jail after the Effective Date, and the Jail will make its best efforts to convene multidisciplinary teams when updating mental health treatment plans for prisoners housed at the Jail prior to the Effective Date.

73. Requirements for treatment plan: Individualized mental health treatment plans will be developed for each prisoner on the mental health caseload. Each plan will include treatment goals and objectives. Specific components will include:

   a. documentation of involvement/discussion with the prisoner in developing the treatment plan, including documentation if the prisoner refuses involvement;

   b. frequency of follow-up for evaluation and adjustment of treatment modalities;

   c. adjustment of psychotropic medications, if indicated;

   d. when clinically indicated, referrals for psychological testing, medical testing and evaluation, including blood levels for medication monitoring as required;

   e. when appropriate, instructions about diet, exercise, personal hygiene issues, and adaption to the correctional environment;

   f. documentation of treatment goals and notation of clinical status progress (stable, improving, or declining); and

   g. adjustment of treatment modalities, including behavioral plans.

74. Timing for treatment plan review: The Director of Mental Health will provide guidelines for individual treatment plan review, which will occur with at least the following frequency:

   a. For prisoners whose medication (prescribed by a psychiatrist or psychiatric nurse practitioner) is stable, every 90 calendar days, or whenever there is a substantial change in mental health status;

   b. for all other prisoners on medication (prescribed by a psychiatrist or psychiatric nurse practitioner) whose medication is not yet stable, every 30 calendar days.

75. **Mental Health Treatment:** The Jail will ensure that prisoners receive treatment that adequately addresses their serious mental health needs in a timely and appropriate manner, in a clinically appropriate setting.

76. Mental Health Therapy: The Jail will ensure that all prisoners with serious mental health needs receive regular, consistent therapy and counseling, in group and individual settings, as clinically appropriate.

77. Mental Health Inpatient Care: The Jail will initiate a Temporary Detention Order or transfer to a hospital offering the needed services when a prisoner is in need of an inpatient level of care.

11

78.     Confidential Mental Health Treatment:  The Jail will ensure that conversations between mental health professionals and prisoners are conducted in a confidential setting to allow for effective information sharing and treatment.

79.   **Psychotropic Medications:**   The Jail will ensure that psychotropic medications are ordered in a timely manner, are consistently delivered to prisoners on lockdown status, and are administered to prisoners in the correct dosages.

80.     Psychotropic Medication Follow-up:  For prisoners beginning a new psychotropic medication or new dosage, a registered nurse, psychiatrically trained, the prescribing psychiatrist, or psychiatric nurse practitioner will conduct a follow-up assessment within 14 calendar days of the prisoner's initial prescription, and thereafter every 30 calendar days until the prisoner's psychotropic medication is stable.  For prisoners whose psychotropic medication is stable, the medication follow up will occur every 90 calendar days. If the medication follow-up is conducted by a psychiatrically trained registered nurse, the nurse shall refer to the prescribing psychiatrist, or psychiatric nurse practitioner, when necessary.

81.     Psychotropic Medication Compliance:  The Jail will ensure that health care staff (e.g., nurse, certified medication technician) document when prisoners refuse prescribed psychotropic medications and follow up by scheduling an appointment with a psychiatrist or psychiatric nurse practitioner after four refusals of the same medication in a one-week time period or three consecutive refusals of the same medication in a one-week time period (unless the medication is monitored by phlebotomy such as Depakote, Lithium, or Clozapine, which will have an appointment scheduled after one refusal for once a day dosing or after two refusals for twice a day dosing).

82.     Anti-Psychotic Medication Use:   The Jail will maintain an anti-psychotic medication registry that identifies all prisoners receiving two or more anti-psychotic medications, the names of medications, the dosage of medications, and the date when each was prescribed.  The lead psychiatrist will review this registry every two weeks to determine continued justification for medication regimen, if one medication could be used to address symptoms, and whether medication changes are needed due to an adverse reaction.  All determinations and required actions will be documented.

83.     Medication Administration Records Audits:  The Jail will ensure that psychotropic medication administration records are audited every 90 calendar days for completeness and accuracy.

84.   **Serious Mental Health Registry:**  The Jail will maintain a mental health registry that identifies all prisoners with serious mental illness, the diagnosis, the date of their last visit with a Qualified Mental Health Professional or Mental Health Professional, and, when applicable, the date of their next visit.

85.   **Suicide Prevention:**  The Jail will ensure that it identifies suicidal prisoners and intervenes appropriately.

86.  Suicide Prevention Training:  The Jail will ensure that all security, medical, and mental health staff have the adequate knowledge, skill, and ability to respond to the needs of prisoners at risk for suicide.

   a.  The Jail will continue its Crisis Intervention Training, a competency-based interdisciplinary suicide prevention training program for security staff, and medical and mental health staff, where appropriate.

   b.  Within six months of the Effective Date, the Jail will review and revise, if appropriate, its current suicide prevention training curriculum to include the following topics, taught by Department of Criminal Justice Services certified trainers or qualified professionals in the field.

      1.  suicide prevention policies and procedures;

      2.  analysis of facility environments and why they may contribute to suicidal behavior;

      3.  potential predisposing factors to suicide;

      4.  high-risk suicide periods;

      5.  warning signs and symptoms of suicidal behavior (including the suicide screening instrument and the medical intake tool);

      6.  observing prisoners on suicide watch and, if applicable, step-down unit status

      7.  case studies of recent suicides and serious suicide attempts;

      8.  practical exercises regarding the proper response to a suicide attempt; and

      9.  the proper use of cut-down tools.

   c.  Within 18 months of the Effective Date, all security staff will complete training on all of the suicide prevention training curriculum topics at a minimum of eight hours for the initial training and two hours of in-service training annually for officers who work in intake, mental health, and restrictive housing units and biennially for all other officers.

   d.  Within six months of the Effective Date (12 months for new hires), the Jail will ensure all security staff are certified in cardiopulmonary resuscitation ("CPR").

87.  Suicide Risk Assessment:  Within three months of the Effective Date, the Jail will provide quality suicide risk assessments of suicidal prisoners by a Qualified Mental Health Professional on a daily basis in a confidential setting.

88.  Suicide Watch:  This system will include constant direct supervision of actively suicidal prisoners when necessary and close supervision of prisoners with lower levels of risk (*e.g.*, 15 minute irregular checks). Officers will document their checks.

a. The Jail will ensure that video surveillance will not be used for a prisoner on "constant" observation nor for the 15 minute irregular checks on "close" observation.

b. The Jail will ensure that an order of "constant" observation requires that a staff member have an unobstructed view of the prisoner at all times.

c. The Jail will ensure that any staff member conducting "constant" observation has no other duties to complete during the time they are conducting the observation.  This means that the staff member cannot observe more than two prisoners on "constant" observation at a time, subject to the approval of the Qualified Mental Health Professional, and the staff member must have direct line of sight to both prisoners.

89. Suicidal Prisoner Housing:  Within 30 days of the Effective Date, the Jail will ensure that prisoners expressing suicidality are provided access to clinically appropriate mental health care in suicide resistant housing with sight lines that permit the appropriate level of staff supervision.  If no suicide resistant cell is available, a suicidal prisoner must be placed on "constant" observation until such housing is available.

90. Suicidal Prisoner Treatment:  Within three months of the Effective Date (except as stated in Paragraph 90 c. below), the Jail will ensure that suicidal prisoners receive access to adequate mental health treatment and follow-up care, including out-of-cell counseling:

a. The Jail will ensure that placement on suicide precautions is made only pursuant to an adequate, timely (within four hours of identification, or sooner if clinically indicated), and confidential assessment and is documented, including level of observation, housing location, and conditions of the precautions.

b. Prisoners requiring suicide watch will be seen by a Qualified Mental Health Professional as soon as reasonably possible but no later than within a working shift (which as of the Effective Date of this Agreement is 12 hours).  Note that on weekends, the timeframe may be within 16 hours to account for overnight.

c. In accordance with Paragraph 100, prisoners on suicide precautions will be offered out-of-cell time for clinically appropriate activities and showers, at least 4 hours per day.

d. Qualified Mental Health Professionals will assess and interact with (not just observe) prisoners on suicide precautions on a daily basis and will provide adequate treatment to such prisoners.

e. The Jail will ensure that prisoners are discharged from suicide precautions or crisis level care as early as possible, and for prisoners with serious mental illness and/or on psychotropic medications such discharge will be approved by a licensed Qualified Mental Health Professional, in consultation with a psychiatrist or psychiatric nurse practitioner when clinically indicated.  All prisoners discharged from suicide precautions or crisis level of care must

14

continue to receive timely and adequate follow-up assessment and care, at a minimum of within 24 hours and again 7 days following discharge. A Qualified Mental Health Professional may schedule additional follow-ups within the first 7 calendar days of discharge if clinically indicated. A Qualified Mental Health Professional will update a treatment plan within 7 calendar days following discharge when necessary.

91. **Psychiatric Hospitalization/Crisis Services:** The Jail will ensure that prisoners requiring emergency psychiatric hospitalization or who are acutely mentally ill receive timely and adequate treatment by initiating a Temporary Detention Order or transferring to a hospital offering the needed services.

92. **Mental Health Achievement Awards**: The Jail will develop and implement a mental health achievement award program.

93. **Mental Health Release Planning:** The Jail will provide release planning for prisoners with a serious mental illness, including the following:

94. Release Plan: Developing a release plan, in conjunction with the appropriate Community Services Board in the member jurisdictions, no later than 30 days after the prisoner's Mental Health Treatment Plan is developed, which will include collecting information regarding the prisoner's needs in "release planning areas" (housing, transportation, bridge psychotropic medications, medical/mental health/substance abuse services, income/benefits establishment, and family/community/social supports) and preliminary recommendations for services to address those needs;

95. Warm Hand-Off: Arranging an appointment with community mental health providers and ensuring, to the extent possible, that prisoners meet with that community mental health provider prior to or at the time of discharge to facilitate a warm hand-off;

96. State Prisons Notification: When state prisoners are transferred, the Jail will transfer medical and mental health records prior to or at the same time prisoners are transferred;

97. Discharge Medications and Renewals: Providing a minimum of 14 days of psychotropic medication to prisoners prescribed such medication and released from the facility (excluding those released to another correctional facility), by providing these prisoners with their remaining psychotropic medication upon release and arranging with local pharmacies to have prisoners' prescriptions filled when fewer than 14 days of psychotropic medications remain.

98. **Collaboration between Mental Health, Security Staff, and Jail Leadership:** The Jail will ensure adequate collaboration between mental health staff (especially psychiatry and psychology), security staff, and Jail leadership, including ensuring adequate multidisciplinary treatment plans, the collaborative planning of the clinical treatment of prisoners' mental health needs, the collaborative use of mental health records, and collaborative management of mental health services generally. Mental health staff, security staff and Jail leadership will be informed of the policies, procedures, and practices on all housing units and, when appropriate, the mental health needs of prisoners

15

transferring between housing units.  Adequate communication between mental health staff, security staff and Jail leadership will involve, in part, ensuring that leadership is routinely informed of the resource needs of the Jail's mental health program.

99.  Mental Health Training for Security Staff:  Security staff providing security for prisoners with SMI will receive documented training regarding security and supervision issues specific to prisoners with mental illness, including:

    a.  Use of de-escalation techniques to calm prisoners who have or may have SMI before resorting to use of force, discipline, or restrictive housing; and

    b.  Signs of mental illness and indications of when referrals should be made to mental health staff.

**HOUSING FOR PRISONERS WITH SERIOUS MENTAL ILLNESS**

100.  **Housing for Prisoners with SMI:**  Within one year of the Effective Date, housing for prisoners with SMI will be provided in general population, mental health units, secure mental health units, and acute mental health units as outlined below.

101.  **Policies and Procedures for Mental Health Units**:  Following the process outlined in the Policies and Procedures section above, policies and procedures will detail the criteria for admission into the mental health units, secure mental health units, and acute mental health units and the levels of care provided to prisoners in those units.

102.  **Mental Health Units:**

    a.  Mental health units function similar to a general population unit in which prisoners are out of their cells the majority of the day.

    b.  There may be multiple mental health units, each serving a different sub-population of prisoners depending on the level of mental health acuity (*e.g.*, step-down from inpatient psychiatric hospitalization or suicide watch, active psychosis but not a threat to themselves or others, *etc.*).

    c.  Mental health units will have dedicated mental health staffing in accordance with the staffing plan described at Paragraph 24 to provide dedicated mental health programming available to all prisoners in these units.

103.  **Secure Mental Health Units:**  Secure mental health units are dedicated to providing the necessary mental health services and other accommodations needed by prisoners with SMI who have been identified as having engaged in violent acts and who require additional security staff/measures.

    a.  Prisoners who are placed in a secure mental health unit will be offered a minimum of:

        1.  at least 10 hours of *structured* out-of-cell activities each week, with two of the 10 scheduled hours used for individual or group therapeutic treatment sessions Monday through Friday, with each session lasting approximately one hour and detailed in that prisoner's individualized treatment plan.  At least one hour of *structured* out-of-cell activity will occur on Saturdays, and

16

2. at least two hours of *unstructured* out-of-cell recreation with other prisoners each day, including exercise, dining, and other leisure activities that provide opportunities for socializing, for a total of 14 hours per week.  In the event of an emergency lockdown or similar occurrence, the Jail will make its best efforts to make up the missed hours within a week.

3. The Jail will make its best efforts to offer more out-of-cell activities than the minimum 24 hours per week for each prisoner.

b. All out-of-cell time in the secured mental health unit will be documented, indicating the type and duration of activity.

104. **Acute Mental Health Unit**

a. An acute mental health unit is for suicide watch observation and can be combined with a medical or mental health unit or have cells on other housing units that are designated as suicide watch observation cells.

b. Prisoners on an acute mental health unit will be offered out-of-cell time for clinically appropriate activities and showers, at least 4 hours per day Monday through Friday and two hours per day on Saturday and Sunday, with activities determined by a Qualified Mental Health Professional and detailed in that prisoner's individualized treatment plan.

**RESTRICTIVE HOUSING**

105. **Restrictive Housing Use on Prisoners with Serious Mental Illness:**  The Jail will ensure that practices regarding the use of restrictive housing for prisoners with serious mental illness comport with the Constitution and the Americans with Disabilities Act.

106. Jail Staff will ensure that restrictive housing is not used as an alternative to adequate mental health care and treatment.

107. Within 24 hours of placement in any form of restrictive housing, all prisoners on the mental health caseload will be screened by a Mental Health Professional to determine whether the prisoner has a SMI, and whether there are any other acute mental health contraindications to restrictive housing.

108. If a prisoner with SMI in restrictive housing suffers a deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, or if a prisoner in restrictive housing develops signs or symptoms of SMI where such signs or symptoms had not previously been identified, the prisoner will immediately be referred for appropriate assessment and treatment from a Qualified Mental Health Care Professional who will recommend appropriate housing or recommend initiating a Temporary Detention Order.

109. The Jail will document the placement and removal of all prisoners to and from restrictive housing.

110. For prisoners with SMI, restrictive housing units will provide: (a) meals that meet the same standards for general population prisoners; (b) access to showers not less than three days per week; (c) rights of visitation and communication by those

properly authorized as clinically indicated; (d) access to reading and writing materials unless clinically contraindicated; and (e) access to a radio or television if confinement exceeds 30 days.

111.  No prisoners with SMI will be placed in restrictive housing on administrative restriction status absent Extraordinary Circumstances which are approved with documented reasons by the Superintendent and Director of Mental Health Services.

    a.  In addition to the Extraordinary Circumstances, prisoners who request to be placed on administrative restriction status will not be subject to this provision, but will be monitored according to Paragraph 115.

    b.  For prisoners who request to be placed on administration restriction status, the Jail will investigate the reason for the request to determine if there is an institutional problem that the Jail needs to address.

112.  If a prisoner with SMI is placed in restrictive housing on administrative restriction status, approval will be renewed with documented reasons by the Superintendent and Director of Mental Health Services, or their designee, weekly.

113.  In accordance with Paragraph 100, any prisoners with SMI in restrictive housing on administrative restriction status will be moved to the appropriate mental health unit unless there are Extraordinary Circumstances in which case the above process in Paragraph 112 applies, and each prisoner will be evaluated every 30 days thereafter to determine whether he or she could be moved to a less restrictive housing unit.

114.  Any determination not to divert or remove a prisoner with SMI from restrictive housing on disciplinary restriction status will be documented in writing and include the reasons for the determination.

115.  Prisoners with SMI who are not diverted or removed from restrictive housing will be offered a heightened level of care that includes the following:

    a.  If on medication, will receive at least one daily visit from a Registered Nurse.

    b.  Will be offered a face-to-face, therapeutic, confidential, out-of-cell session with a Mental Health Professional at least once per week.

    c.  Mental Health Professionals will conduct rounds three times a week, or more if clinically indicated, to assess the mental health status of all prisoners in restrictive housing and the effect of restrictive housing on each prisoner's mental health to determine whether continued placement in restrictive housing is appropriate.

    d.  Mental Health Professionals rounds will not be a substitute for treatment and will be documented.

116.  Prisoners with SMI who are housed in restrictive housing for more than 30 days will have their cases reviewed by the Superintendent and Director of Mental Health Services, or their designee, weekly following the 30 days and will only remain in restrictive housing after the Superintendent and Director of Mental Health Services,

or their designee, approve the continued placement every week with documented reasons.

117. **Restrictive Housing Placement Based on Disability:**  The Jail will ensure that prisoners with mental health disabilities are not unnecessarily placed in restrictive housing based on their disabilities, and will provide appropriate treatment.

    118.  No prisoners with mental health disabilities will be placed in restrictive housing for "mental deficiencies" or the equivalent.

QUALITY ASSURANCE

119. **Quality Assurance Program:**  The Jail will ensure that its quality assurance program is adequately maintained and identifies and corrects deficiencies with the medical and mental health care system.  The Jail will develop, implement, and maintain a system to ensure that trends and incidents involving deficiencies in medical and mental health care are identified and corrected in a timely manner.

    120.  Within six months of the Effective Date, the Jail will draft and/or revise Quality Assurance policies and procedures, consistent with the process in the Policies and Procedures Section above, to identify and address serious deficiencies in medical and mental health care, including sick call, health assessments, intake, chronic care, medication administration, emergency care, and infection control.

    121.  Within three months of the Effective Date, the Jail will begin to implement monthly quality assurance mechanisms at the individual and system levels to prevent or minimize harm to prisoners.  It is understood that these quality assurance mechanisms will mature and become more sophisticated over time.  These quality assurance mechanisms will track and analyze patterns and trends regarding the provision of medical and mental health care.  On an annual basis, this data will be reviewed for its effectiveness in order to modify, add, or delete data, subject to the approval of the United States, which approval shall not be unreasonably withheld. Each monthly report will include:

        a.  Relevant aggregate data, including:

            1.  the time elapsed between prisoners' requests for medical or mental health services and the provision of services by a Registered Nurse, Medical Provider, or Qualified Mental Health Professional/ Mental Health Professional, separated by the following categories (as well as the triage categories):

                i.  nurse sick call;

                ii.  Medical Provider referral;

                iii.  psychiatrist or psychiatric nurse practitioner referral;

            2.  for prisoners on the Serious Mental Illness Registry, the Chronic Care Registry, and the Medical Specialist Registry, a delinquency report that shows how many prisoners with scheduled appointments missed those appointments and why;

3. the number of prisoners sent to outside facilities and "admitted" for inpatient care;

4. the number of prisoners sent to the emergency room and the number "admitted" for inpatient care, with the reason admitted and the clinical diagnosis and prognosis for each prisoner if known by the Jail, as well as the reasons not admitted for those prisoners who were not admitted if known by the Jail;

5. the number of prisoners being treated for HIV;

6. the number of pregnant prisoners and the number referred for obstetrics services;

7. the number of prisoners who are PPD positive and the number of chest x-rays performed to assess for tuberculosis;

8. the number of prisoners treated for possible substance abuse withdrawal, with clinical diagnosis and prognosis listed;

9. the number of prisoners prescribed psychotropic medications;

10. the average amount of time between visits with a Qualified Mental Health Professional/ Mental Health Professional for prisoners on psychotropic medications;

11. the number of prisoners placed on suicide watch;

12. the average length of time prisoners are kept on suicide watch;

13. the number of times the restraint chair was used on prisoners with SMI;

14. the number of OC spray uses on prisoners with SMI;

15. the number of suicides;

16. the number of suicide threat incidents;

17. the number of self-harm incidents;

18. the number of psychiatric hospitalizations;

19. the Medical/Mental Health Grievance Substantiation Report;

20. the number of prisoner on prisoner assaults by and on prisoners with SMI;

21. the number of prisoner on staff assaults by prisoners with SMI;

22. the number of prisoners with SMI in restrictive housing, broken down by status of restrictive housing;

23. the length of stay for each of the prisoners with SMI in restrictive housing;

24. the number and type of educational or mental health achievements for prisoners with SMI;

25. a list of prisoners who have SMI that includes their diagnoses, their current charges, and the Feeder Jail;

26. for medical and mental health staff, the vacancy report with positions and days vacant;

27. a list of new hires and terminations for medical and mental health staff identified by position;

28. a list of all medical and security staff who have undergone training required under this Agreement and the training that was provided; and

29. the number of hours of training each staff member receives on suicide prevention and mental health matters each year (this will be reported annually).

122. Within three months of the Effective Date, the Jail will develop and implement a Quality Improvement Committee that will:

a. review and analyze the data collected pursuant to Paragraph 121;

b. identify trends and interventions;

c. make recommendations for further investigation of identified trends and for corrective action, including system changes; and

d. monitor implementation of approved recommendations and corrective actions.

123. Based on these monthly assessments, the Jail will recommend and implement changes to policies and procedures as needed.

124. All monthly reports will be provided to the Monitor and the United States.

125. The Jail will ensure that medical and mental health staff are included as part of the continuous improvement and quality assurance process.

126. **Morbidity-Mortality Reviews:**   The Jail will conduct timely and adequate multidisciplinary morbidity-mortality reviews for all prisoner deaths, including suicides, and serious suicide attempts (*i.e.*, suicide attempts requiring medical hospital admission).

127. The Morbidity and Mortality Review Committee will include one or more members of Jail operations, the medical department, the mental health department, and related clinical disciplines as appropriate.  The Morbidity and Mortality Review Committee will:

a. ensure the following are completed, consistent with National Commission of Correctional Health Care standards, for all prisoner deaths and serious suicide attempts:

1. a *clinical mortality/morbidity review* (an assessment of the clinical care provided and the circumstances leading up to the death or serious suicide attempt) is conducted within 30 days;

21

2. an *administrative review* (an assessment of the correctional and emergency response actions surrounding a prisoner's death or serious suicide attempt) is conducted in conjunction with corrections staff;

3. a *psychological autopsy* (a written reconstruction of an individual's life with an emphasis on factors that led up to and may have contributed to the death or serious suicide attempt) is performed on all deaths by suicide or serious suicide attempts within 30 days;

4. treating staff are informed of pertinent findings of all reviews;

5. a log is maintained that includes:

   i. patient name or identification number;

   ii. age at time of death or serious suicide attempt;

   iii. date of death or serious suicide attempt;

   iv. date of clinical mortality review;

   v. date of administrative review;

   vi. cause of death (e.g., hanging, respiratory failure) or type of serious suicide attempt (e.g., hanging, overdose);

   vii. manner of death, if applicable (e.g., natural, suicide, homicide, accident);

   viii. date pertinent findings of review(s) shared with staff; and

   ix. date of psychological autopsy, if applicable; and

b. ensure that the Jail takes action to address systemic problems identified during the reviews.

128. Ensure the senior Jail staff have access to all such reviews conducted by the Jail's medical or mental health provider.

## IV.  MONITOR

129.   The Parties agree that James Conrad Welch will be the Monitor retained by the Jail to assess and report whether the provisions of the Agreement have been implemented and to provide technical assistance to help HRRJ comply with its obligations under the Agreement.  The Parties agree to file a joint motion asking the Court to appoint the Monitor.

130.   The Monitor will be appointed for a period of three years from the Effective Date, subject to an evaluation by the Court to determine whether to renew the Monitor's appointment until the termination of this Agreement.  In evaluating the Monitor, the Court will consider the Monitor's performance under this Agreement, including whether the Monitor is completing its work in a cost-effective manner and on budget, and is working effectively with the Parties to facilitate the Jail's efforts to comply with the Agreement's terms, including by providing technical assistance to the Jail.  The Monitor may be removed for good cause by the Court at any time, on motion by any of the Parties or the Court's own determination.

131.   The Jail will pay the Monitor an amount per year to be agreed upon by the Parties for performing all of the Monitor's duties under this Agreement.

132.    The Monitor will only have the duties, responsibilities, and authority conferred by this Agreement.  The Monitor will be subjected to the supervision and orders of the Court.

133.    The Monitor will conduct compliance reviews.  The purpose of the compliance reviews is to determine compliance with the material requirements of this Agreement.  Compliance reviews will be conducted in a reliable manner based on accepted means and methods.  The Monitor will provide the Parties with the underlying analysis, data, methods, and sources of information relied upon in the reviews.

134.    Neither HRRJ, the United States, nor any of their staff or agents will have any supervisory authority over the Monitor's activities, reports, findings, or recommendations to implement the Agreement.

135.    The Monitor may contract or consult with other persons or entities to assist in the evaluation of compliance.  The Monitor will pay for the services out of his/her budget.  The Monitor, and any staff or consultants retained by the Monitor, will comply will HRRJ's PREA disclosure form.  The Monitor is ultimately responsible for any compliance assessments made under this Agreement.

136.    The Monitor will be permitted to engage in ex parte communications with the Jail, the United States, and the Court regarding this Agreement.

137.    In the event the Monitor is no longer able to perform its functions, is removed, or is not extended, within 60 days thereof, the Parties will together select and advise the Court of the selection of a replacement Monitor, acceptable to both.  If the Parties are unable to agree on a Monitor, each Party will submit the names of up to two candidates, along with the resumes and cost proposals, to the Court, and the Court will select and appoint from among the qualified candidates.

138.    Should a Party to this Agreement determine that the Monitor has exceeded its authority or failed to satisfactorily perform the duties required by the Agreement, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors of the Monitor.   In addition, the Court, on its own initiative and in its sole discretion, may replace the Monitor or any member of the Monitor's team for failure to adequately perform the duties required by this Agreement.

139.    The Monitor and the United States (and its agents) will have full access to persons, employees, facilities, buildings, programs, services, documents, data, records, materials, and things that are necessary to assess HRRJ's progress and implementation efforts with this Agreement.  Access will include departmental or individual medical and other records.  The United States and/or the Monitor will provide reasonable notice of any visit or inspection.  Advance notice will not be required if the Monitor or the United States has a reasonable belief that a prisoner faces a risk of immediate and serious harm.  Access is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with information disclosed to the Monitor or the United States under this paragraph.

140.    In completing his or her responsibilities, the Monitor may require written reports and data from HRRJ concerning compliance, as outlined in the Agreement.  HRRJ will provide to the Monitor and the United States a confidential, bi-annual Status Report detailing progress at the Jail, until the Agreement is terminated, the first of which shall be filed within 30 days of the Effective

Date.  Status Reports shall make specific reference to the Agreement provisions being implemented.  The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and identify data trends.

141.  Monitor Reports

142.  Within 60 days of the Effective Date, the Monitor will conduct a baseline site visit of HRRJ to become familiar with HRRJ and this Agreement.

143.  Within 90 days of the Effective Date, the Monitor will provide his or her preliminary observations and recommendations in a baseline Monitoring Report (which will follow the same draft and comment process as in Paragraph 144).

144.  The Monitor will conduct an on-site inspection and issue a Monitoring Report for HRRJ six months after the baseline Monitoring Report, and then every six months thereafter.  A draft Report will be provided to HRRJ and the United States in draft form for comment at least 30 days prior to its issuance.  HRRJ and the United States will provide comments, if any, to the Monitor within 15 days of receipt of the draft Report.  The Monitor will consider the responses of HRRJ and the United States and make appropriate changes, if any, before issuing the final Report.

145.  The Monitoring Reports will describe the steps taken by HRRJ to implement this Agreement and evaluate the extent to which HRRJ prisons have complied with each substantive provision of the Agreement.  Each Monitoring Report:

a.  Will evaluate the status of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance.  "Substantial Compliance" indicates that HRRJ has achieved material compliance with the components of the relevant provision of the Agreement.  "Partial Compliance" indicates that HRRJ has achieved material compliance with some of the components of the relevant provision of the Agreement, but significant work remains.  "Non-compliance" indicates that HRRJ has not met the components of the relevant provision of the Agreement.  "Material Compliance" requires that, for each provision, HRRJ has developed and implemented a policy incorporating the requirement, trained relevant personnel on the policy, and relevant personnel are complying with the requirement in actual practice.  The Monitor will review a sufficient number of pertinent documents and interview a sufficient number of staff and prisoners to accurately assess current conditions;

b.  Will describe the steps taken by each member of the monitoring team to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings;

c.  Will contain the Monitor's independent verification of representations from HRRJ regarding progress toward compliance, and examination of supporting documentation; and

d.  Will provide recommendations for each of the provisions in the Agreement outlining proposed actions for at least the next six months for HRRJ to complete toward achieving compliance with the particular provision.

146.   These Monitoring Reports will be filed with the Court and will be written with due regard for the privacy interests of individuals and will not include any information that could jeopardize the institutional security of HRRJ, or safety of HRRJ staff or prisoners.   The Monitoring Reports provide relevant evidence regarding compliance.   The Court determines the facts regarding compliance and the status of compliance pursuant to Sections VI and VII of the Agreement.

147.   Nothing in this Section prohibits the Monitor from issuing interim letters or reports to the United States, HRRJ or the Court in this case should s/he deem it necessary.

148.   If, at any time during the term of this Agreement, the Parties agree that any substantive section (i.e. any small capitalized section tabbed on the far left of the Agreement, such as "SECURITY," "MEDICAL AND MENTAL HEALTH CARE," "MEDICAL CARE," etc.) has reached Substantial Compliance, that section will cease to be subject to active monitoring.

149.   In completing his or her responsibilities, the Monitor may testify in enforcement proceedings regarding any matter relating to the implementation, enforcement, or dissolution of the Agreement, including, but not limited to, the Monitor's observations, findings, and recommendations in this matter.

150.   The Monitor, and any staff or consultants retained by the Monitor, will not: (a) be liable for any claim, lawsuit, or demand arising out of their activities under this Agreement (this paragraph does not apply to any proceeding for payment under contracts into which they have entered in connection with their work under the Agreement); (b) be subject to formal discovery in any litigation involving the services or provisions reviewed in this Agreement, including, but not limited to, deposition(s), request(s) for documents, and request(s) for admissions, interrogatories, or other disclosure; (c) testify in any other litigation or proceeding with regard to any act or omission of HRRJ or any of HRRJ's agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.

151.   The Monitor will not enter into any additional contract with HRRJ while serving as the Monitor.  If the Monitor resigns from his or her position as Monitor, the former Monitor may not enter any contract with HRRJ or the United States on a matter related to this Agreement without the written consent of the other Party while this Agreement remains in effect.  HRRJ will not otherwise employ, retain, or be affiliated with the Monitor, or professionals retained by the Monitor while this Agreement is in effect, and for a period of at least one year from the date this Agreement terminates, unless the United States gives its written consent to waive this prohibition.

## V.  IMPLEMENTATION

152.   Within 30 days of the Effective Date, HRRJ will designate an Agreement Coordinator to coordinate compliance with this Agreement and to serve as a point of contact for the Parties and the Monitor.

25

153.    Early on and throughout the planning and implementation process, HRRJ will, as appropriate, engage with stakeholders including those types of entities involved in their Forensic Advisory Team (*e.g.*, Community Services Boards and Mental Health Courts) to identify their goals, concerns, and recommendations regarding implementation of this Agreement.

154.    HRRJ will create an annual Implementation Plan that describes the actions it will take to fulfill its obligations under this Agreement.  Implementation of this Agreement will be completed in phases as outlined in the Agreement and the Implementation Plan.

155.    Within 30 days of the Effective Date, HRRJ will provide the first Implementation Plan ("Implementation Plan #1") to the United States and the Monitor.  In its Implementation Plan, HRRJ will develop a specific schedule and deadlines for the upcoming year and a general schedule for successive years.  In Implementation Plan #1, HRRJ will develop a specific schedule and deadlines for the first twelve months, in which HRRJ will: (a) draft or revise policies and procedures; (b) complete a staffing plan, (c) develop and deliver training to HRRJ staff and providers concerning the provisions of this Agreement and HRRJ's commitment to fulfilling its obligations under the Constitution and the ADA; (d) develop and implement a Quality Improvement Committee; (e) and develop and implement monthly quality assurance mechanisms to report on aggregate relevant data to prevent or minimize harm to prisoners.

156.    The United States and the Monitor will provide comments regarding Implementation Plan #1 (and any further Implementation Plans) within 30 days of receipt.  HRRJ will timely revise its Implementation Plans to address comments from the United States and the Monitor; the Parties and the Monitor will meet and consult as necessary.

157.    Annually, HRRJ, in conjunction with the United States and the Monitor, will supplement Implementation Plan #1 with further Implementation Plans (#2, #3, *etc.*) to focus on and provide additional detail regarding implementation activities.   HRRJ will address in its further Implementation Plans any areas of non-compliance or other recommendations identified by the Monitor in his or her reports.

## VI. ENFORCEMENT

158.    The United States District Court for the Eastern District of Virginia will retain jurisdiction over this matter for the purposes of enforcing this Agreement as an order of this Court.

159.    During the period that the Agreement is in force, if the United States determines that HRRJ has not made material progress toward substantial compliance with a significant obligation under the Agreement, and such failure constitutes a violation of prisoners' constitutional rights, the United States may initiate enforcement proceedings against HRRJ in Court for an alleged failure to fulfill its obligation under this Agreement.

160.    Prior to taking judicial action to initiate enforcement proceedings, the United States will give HRRJ written notice of its intent to initiate such proceedings, and the parties will engage in good-faith discussions to resolve the dispute.

161.    HRRJ will have 30 days from the date of such notice to cure the failure or otherwise resolve the dispute through the good-faith discussions.  The Parties may agree to extend this time, as reasonable, due to the nature of the issue(s).  At the end of the 30-day period (or such additional time as is reasonable due to the nature of the issue(s) and agreed upon by the United States), in the event that the United States determines that the failure has not been cured or that adequate remedial

measures have not occurred, the United States may initiate contempt proceedings. The United States commits to work in good faith with HRRJ to avoid enforcement actions.

162.     In case of an emergency posing an immediate threat to the health or safety of any prisoner or staff member at HRRJ, however, the United States may omit the notice and cure requirements herein and seek enforcement of the Agreement.

## VII.  TERMINATION

163.     Except where otherwise agreed to under a specific provision of this Agreement, HRRJ will implement all provisions of this Agreement within 4 years of the Effective Date.

164.     This Agreement will terminate in five years, or earlier, if the Parties agree that HRRJ has attained substantial compliance with all provisions of this Agreement and maintained that compliance for a period of one year, or as outlined in Paragraph 167, by order of the Court.

165.     HRRJ may seek termination of any substantive section (i.e. any small capitalized section tabbed on the far left of the Agreement, such as "SECURITY," "MEDICAL AND MENTAL HEALTH CARE," "MEDICAL CARE," etc.) by filing with the Court a motion to terminate that section. The burden will be on the Jail to demonstrate that it has attained and maintained its substantial compliance as to that section for at least one year.

166.     Regardless of this Agreement's specific requirements, this Agreement will terminate, or substantive sections as described in Paragraph 165 may terminate, upon a showing by the Jail that it has come into durable compliance with the requirements of the Constitution and the ADA that gave rise to this Agreement. In order to demonstrate durable compliance, HRRJ must establish with the Court that it is operating in accordance with these requirements and has been doing so continuously for one year.

167.     The burden will be on HRRJ to demonstrate that it has maintained substantial compliance with each of the provisions of this Agreement. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure by HRRJ to maintain substantial compliance. At the same time, temporary compliance during a period of sustained non-compliance will not constitute substantial compliance.

168.     The burden will be on HRRJ to demonstrate they have achieved substantial compliance with a particular section of this Agreement.

169.     Should any provision of this Agreement be declared or determined by any court to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions will not be affected. The Parties will not, individually or in combination with another, seek to have any court declare or determine that any provision of this Agreement is invalid.

170.     The Parties agree to work collaboratively to achieve the purpose of this Agreement. In the event of any dispute over the language, requirements or construction of this Agreement, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution.

171.     This Agreement will constitute the entire integrated agreement of the Parties.

172.     Any modification of this Agreement will be executed in writing by the Parties, will be filed with the Court, and will not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

## VIII.  GENERAL PROVISIONS

173.    If necessary, HRRJ will coordinate with or enter into Memoranda of Understanding with all appropriate State, County, or City agencies in order for HRRJ to comply with provisions of this Agreement.

174.    The United States and HRRJ will each bear the cost of their own fees and expenses incurred in connection with this case.

175.    All services mentioned or described in this Agreement are subject to reasonableness standards and nothing herein will be interpreted to mean that the provision of services are unlimited in amount, duration, or scope.

176.    The Agreement is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of HRRJ to implement the terms of this Agreement.

177.     The Parties agree that, as of the Effective Date of this Agreement, litigation is not "reasonably foreseeable" concerning the matters described in this Agreement.  To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Agreement, the Party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves any Party of any other obligations imposed by this Agreement, including the document creation and retention requirements described herein.

178.    HRRJ will not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation or the Monitor's activities related to this Agreement.  HRRJ will timely and thoroughly investigate any allegations of retaliation in violation of this Agreement and take any necessary corrective actions identified through such investigations.

179.    Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Agreement.

180.    The Parties will promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof.

181.    The Parties represent and acknowledge this Agreement is the result of extensive, thorough, and good faith negotiations.  The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations set forth in the Department of Justice's CRIPA Notice dated December 19, 2018.  Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of a Party is duly authorized to enter into this Agreement and to bind that Party to the terms and conditions of this Agreement.

182.    This Agreement may be executed in counterparts, each of which will be deemed an original, and the counterparts will together constitute one and the same Agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

183.    The performance of this Agreement will begin immediately upon the Effective Date.

184.    HRRJ will maintain sufficient records and data to document that the requirements of this Agreement are being properly implemented and will make such records available to the Monitor

and the United States for inspection and copying on a reasonable basis. Such action is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both the United States and the Monitor, and any staff or consultants retained by the Monitor, will hold such information in strict confidence to the greatest extent possible.

185.   "Notice" under this Agreement will be provided by email to the signatories below, and their counsel, or their successors.

FOR THE UNITED STATES:

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section

JUDY C. PRESTON
Principal Deputy Chief, Special Litigation Section

G. ZACHARY TERWILLIGER
United States Attorney

LAURA L. COWALL
Special Counsel, Special Litigation Section

CLARE P. WUERKER
Assistant United States Attorney
VA Bar No. 79236
United States Attorney's Office
Eastern District of Virginia

KYLE E. SMIDDIE
PA Bar No. 311676
Trial Attorney
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Telephone: (202) 307-6581
kyle.smiddie@usdoj.gov

29

FOR HAMPTON ROADS REGIONAL JAIL
AUTHORITY:

_____
SHARON P. SCOTT
Chairman
Hampton Roads Regional Jail Authority

_____
CHRISTOPHER WALZ
Superintendent
Hampton Roads Regional Jail

_____
JEFF W. ROSEN
Attorney
Hampton Roads Regional Jail Authority

30