

RECEIVED

NOV 30 2021

R. B. SMITH
SENIOR U.S. DISTRICT JUDGE, NORFOLK, VA

NOVEMBER 30, 2021

## HAMPTON ROADS REGIONAL JAIL

# SECOND MONITORING REPORT

## CIVIL NO. : 2:20-CV-410

## JAMES C. WELCH, RN, HNB, BC
## COURT APPOINTED MONITOR

HRRJ SECOND REPORT NOVEMBER 30, 2021

## Table of Contents

Scope of Report……………………………………………......... 3

Executive Summary……………………………………………… 3

Introduction…………………………………………………… 6

Substantive Provisions…………………………….………...…… 8

Appendix A- Summary of Compliance………………………...… 46

Note: Appendix B- The Agreement is included as a separate document

HRRJ SECOND REPORT NOVEMBER 30, 2021

## Scope of this Report

This second report is provided in compliance with paragraph #144 of the Agreement six months after the First Monitoring Report. It covers the time frame from May 1, 2021 – October 31, 2021, with additional information being provided from the November 2021 site visit to assure accuracy. This report will describe the steps taken by HRRJ to implement this Agreement and evaluate the extent to which Hampton Roads Regional Jail (HRRJ) has complied with each substantive provision of the Agreement. The report will evaluate the status of compliance for each relevant provision of the Agreement using these standards:

(1) Substantial Compliance; (2) Partial Compliance: and (3) Non-Compliance.

"Substantial Compliance" indicates that HRRJ has achieved material compliance with the components of the relevant provision of the Agreement. "Partial Compliance" indicates that HRRJ has achieved material compliance with some of the components of the Agreement, but significant work remains. "Non-compliance" indicates that HRRJ has not met the relevant provision of the Agreement.

In the body of the report, the degree of compliance is *italicized*, and recommendations are <u>underlined</u>. In Appendix A (Summary of Compliance), the degree of compliance is abbreviated as: Substantial Compliance will be noted as "SC", Partial Compliance as "PC" and Non-Compliance as "NC".

Some of the substantive provisions began during this second period of review, therefore they will have their first rating in this report. "NR", Not Rated will be used in this second report on items that are still in development and are ongoing.

Pending Review "PR" will be used to mark those overarching provisions that require several provisions to be substantially compliant and will occur over time.

For reference, The Consent Agreement is included as Appendix B as a separate document.

## Executive Summary

HRRJ has continued to be challenged during this second phase of the Agreement period. COVID - 19 has continued to cause unforeseen problems for the institution from recruitment and retention to limits that have been necessary to be placed on movement, group therapy sessions and general operation of the facility. These have caused delays in the implementation of the Agreement and have caused serious problems in hiring of security and healthcare staff. These challenges have therefore delayed the ability of HRRJ to implement fully some portions of the Agreement. Currently there are no active cases of COVID - 19 in the jail. Over the past few months one hundred twenty-eight (128) HRRJ staff, thirty-five (35) Wellpath staff and three hundred eighty-seven (387) inmates have been vaccinated against COVID-19. HRRJ will continue to provide vaccinations to staff and inmates over the next few months. Booster shots are beginning on November 19, 2021 for eligible staff and inmates.

Change in Administrative leadership shortly after the initial start-up of the Agreement caused a slight delay in implementation, however the Administration has moved forward to make necessary changes in the ability of HRRJ to begin to meet the substantive provisions in the Agreement, they have also made changes to be able to move previous non-compliant areas into partial compliance. However,

with the addition of some provisions which HRRJ had one year to begin implementing, some of those areas are non-compliant. These relate to opening of special mental health units. Security, behavioral and other healthcare staffing will need to be hired and trained to meet the threshold to open these units.

During this first year of the Agreement the change in administration has improved the likelihood of HRRJ's ability to meet challenges faced by both COVID – 19 and the Agreement. Communication between security staff and the healthcare staff, both medical and behavioral health have continued to improve. In this first year of the Agreement significant improvement has been made between security and healthcare staff, and among staff in all areas of the HRRJ. As was noted in the previous report, the use of spray (Oleoresin capsicum or "pepper spray) to contain inmates has significantly decreased. There have only been a handful of uses compared to multiple uses in a week. Behavioral health or medical staff have been used to help de-escalate situations where "pepper spray" had been used as a routine occurrence. These actions result in positive outcomes and do not involve the use of force. As has been noted by the Monitor, this has occurred over 75 times over the past year. It is noted that not all situations will resolve in such a manner, but it was noted that the improved communication among the entire HRRJ staff has resulted in more coordination and cooperation between and among staff. Mental health training which is occurring monthly has also helped to provide opportunities for security staff to be provided alternative actions to the use of force. This training must be ongoing and rigorous to be effective.

Staffing is continuing to be a challenge. A new Human Resources Manager (HRM) was hired in June of 2021. During her tenure the security vacancy numbers have slightly decreased. Rather than having more staff leaving then hired, the number hired is beginning to show a slight increase. It is a small increase, but a good trend. As noted previously, the HRM has instituted innovative onboarding techniques to improve both the quality and the quantity of staff hired. That being said, there continues to be significant sworn officer position vacancies. Improving the staffing situation has been hampered by the direct effects of COVID and the indirect economic impact of COVID. This continues to have a negative effect on the available pool of candidates which remains minimal. HRRJ has converted several sworn positions to civilian positions which are placed in areas where a sworn officer is not required to assure the safety of the facility. As noted in the First Monitor Report, the HRRJ Jail Board and finance committee must review the salary structure of all positions in the HRRJ facility to assure they are commensurate with similar positions in the area. This was not completed during this first year and must become a priority for the HRRJ Board. HRRJ will need to be vigilant with their sworn and civilian staff to assure safety and security of inmates and staff. Wellpath must review the salary structure for all healthcare staff, both medical and behavioral health.

The HRRJ Board must also decide on the hiring of a permanent Superintendent. Col. Vergakis was hired as the Interim in December of 2020 and began his tenure with the retirement of the previous Superintendent in January 2021. It has been eleven (11) months, so if HRRJ is to continue to move forward with the changes instituted, a permanent Superintendent needs to be appointed. There are some changes that will be hampered unless there is the full authority of a permanent Superintendent.

As noted in the First Monitor Report the atmosphere of the institution and ability to move forward in a positive manner has continued. In the past, security and healthcare staff identified safety and security as major concerns for them to be able to carry out their responsibilities. This has changed over the past eleven (11) months. Previously, nursing, and behavioral health staff were reluctant to work in particular areas of the institution for fear of their personal safety. This concern has been all but eliminated and the

cooperative nature between and among all areas of the institution allow for the free flow of information on concerns. If there is a potential situation developing, Healthcare Staff feel comfortable making security staff aware of the issue, and vice versa. There are no areas in the institution where any staff are fearful of working. The change in HRRJ administration in January created the atmosphere for change and improvement to occur.

Census reduction has continued to have a positive effect on the institution. At the beginning of 2021 the ADP was seven hundred (700). As of October 31, there were three hundred fifty-eight (358) inmates at the institution. It is noted that HRRJ staff work hard to assure that they review the medical and mental health needs of each of the inmates who may be returned to a feeder jail. As those institutions sent inmates with the highest medical and mental health needs to HRRJ. Due to COVID, all correctional institutions are having difficulty recruiting security and healthcare staff. This is a concern with the ability of the feeder jails to be able to sustain care that HRRJ has provided to those high acuity inmates when they are returned to the feeder jail. The feeder jails send inmates to HRRJ with the understanding that HRRJ is better equipped to meet the medical and mental health needs of high acuity inmates and thus raises a concern when inmates are returned to the feeder jail. As conditions improve at HRRJ it is anticipated that some feeder jails will begin to send a few of those inmates back to HRRJ.

HRRJ has improved, but it will take time to recruit and train security and healthcare staff to be able to accept feeder jail inmates at a faster rate. Currently HRRJ may receive five (5) to ten (10) a week from all the feeder jails. Until HRRJ can accept a greater number of inmates it will be incumbent on the feeder jails to keep up with the care of those who were sent to them temporarily. As was discussed previously, feeder jails have done a good job of returning those who require a higher level of care back to HRRJ.

At the April HRRJ Board meeting Interim Superintendent Vergakis noted that he and his administrative staff were focusing on the consolidation of Pods (housing units within HRRJ), reducing the number of people in restrictive housing, the DOJ Agreement, recruitment, retention, the medical contract, a 5-year strategic plan and leadership development.

At the October HRRJ Board meeting the Board took action to provide a one-time bonus to civilian and part-time staff who did not qualify for the $3,000 bonus funded by the Compensation Board in September 2021 and paid to Sworn officers. The Authority Finance Committee recommended, and the HRRJ approved, a bonus in the amount of $1,500 for civilian employees and a bonus of $750 for part-time employees. It is anticipated that those who had not received the one-time bonus should see it in their paychecks within a month, due to the pay cycle.

An area of significant improvement is the number of persons with Serious Mental Illness (SMI) who are in Restrictive Housing (RH) for more than twenty-one (21) days. In the Baseline Report (as of September 2020), there were one hundred forty-one (141) persons with SMI in RH and forty-six (46) of those had been there for more than twenty-one (21) days. In the First Monitoring Report (as of March 2021), there were only forty-three (43) persons with SMI in RH and twenty (20) of those had been there for more than twenty-one (21) days. As of the end of October 2021, there were only thirty-five (35) persons with SMI in RH and only four (4) of those had been there for more than twenty-one (21) days. All four were on a disciplinary restriction due to an infraction. While the reduced ADP has had an influence on the RH numbers, it is the concerted effort by all the staff and HRRJ that has produced this drastic reduction in the use of restrictive housing for all inmates.

It is important to note that in the past those who were on Protective Custody were also housed in a RH Unit. They are now housed in a separate unit with the ability to enjoy less restrictions than when they were in the RH unit.

Some healthcare systems continue to be a challenge. As will be noted later in the report, sick call and medication refills seem to be those that need the most work. It will be incumbent on the DON, Medical Director, and new HSA to assure systems are in place for inmates to have access to the sick call process and ongoing medication delivery systems.

It is positive to note that HRRJ has begun to develop their multidisciplinary treatment teams. Over the past few weeks, even with the shortage of staff they have created nineteen (19) treatment plans based on the team approach. HRRJ's plan is to work on treatment plans with the multidisciplinary teams after the ICC meetings each Wednesday. It will be important to keep up with these plans to meet the Substantive provisions related to mental health.

In discussions with the staff at HRRJ and the HRRJ Jail Board it was emphasized that meeting the Substantive Provisions of the Agreement and making the changes necessary for sustained improvement were a slow process. This Monitor continues to state, "This is a marathon, not a sprint". There will be times potentially when you improve and struggle to keep up, but you need to keep your eye on the goal, continued improvement. To work through all the areas of the agreement, a sustained effort will be necessary to put in place safeguards to assure continued compliance. A robust Quality Improvement System will assist with assuring continued compliance. Current efforts by HRRJ Administration and Staff continue to show promise.

## Introduction

The Monitor has visited the HRRJ every month since the signing of the contract. This allows for observation of day-to-day operations of the institution and improvements being implemented. During all monitoring visits no area of the facility is off limits and are available for observation and inspection. Due to the COVID - 19 delta variant restrictions for visitation are still in effect. Lawyer visits are permitted. Over the next few weeks and months decisions will be made to allow for relaxation of some of those as more inmates are vaccinated. On September 1, 2021 Col. Vergakis sent a memo to all employees and contractors informing them that: On or before October 1, 2021 all workforce members must either: (a) accurately and truthfully provide proof of the date of the completed vaccination to Human Resources (i.e., receipt of the second dose in a 2-dose series vaccination such as Pfizer of Moderna, or receipt of a single-dose vaccine such as Johnson & Johnson) or (b) obtain an approved Office of Human Resources (OHR) vaccine exemption (with the specification of any reasonable accommodation if applicable and available). As of November 5, 2021, one hundred and sixty-five (165) HRRJ staff and contractors are fully vaccinated and thirty (30) get weekly checks for a negative status for COVID – 19. Wellpath staff have provided COVID – 19 vaccinations to one hundred and twenty-eight (128) staff and four hundred and one (401) vaccinations to inmates, as of November 18, 2021. Some staff and inmates acquired their vaccinations in the community or at other jail facilities. HRRJ started to provide booster shots to those eligible on November 19, 2021. Temperature checks and masks continue to be required for entry into the facility.

A snap shot from the HRRJ Board Agenda of November 18, 2021 showed of the three hundred and fifty-eight (358) inmates in custody in October 31, 2021 showed: two hundred and sixty-four (264) with a chronic care diagnosis, thirteen (13) patients with HIV, forty-eight (48) with an endocrine diagnosis, one (1) on Hepatis C treatment, one hundred and sixteen (116) hypertension/cardiovascular diagnosis, three (3) pregnant woman, four (4) patients receiving cancer treatment – one (1) with metastasis and a poor prognosis, six (6) inmates over 65, two (2) paraplegic inmates, three (3) patients on dialysis, two (2) needing assistance with activities of daily living (ADL's), two (2) patients scheduled for surgery for underlying medical conditions, one (1) patient post liver transplant, one (1) sickle cell, one (1) Crohn's with IV infusions, one hundred and twelve (112) with an SMI (serious mental illness diagnosis), eleven (11) Temporary Detention (TDO) orders) completed since May. Out of an average daily population (ADP) of three hundred and fifty-eight (358), three hundred and two (302) are on medications, and two hundred and fifteen (215) inmates are on psychotropic medications. This information may give the reader a sense of the acuity and challenges faced in the daily routine of taking care of inmates at HRRJ.

Col. Vergakis has made significant inroads since he was hired as the Interim Superintendent in December. Over the past few months dialogue about staff has been open and direct. This has created an open atmosphere which has replaced the previous tension observed during the first few months of monitor visits. Items are discussed and action taken to move things forward. Nothing is left to chance or not allowed to be brought up for discussion and action.

Lt. Col. Anderson is a great complement to Col. Vergakis. He has taken up the role as the Asst. Superintendent addressing needed security issues and worked to address the way in which inmates are housed. Since the last report all inmates are reviewed and when a situation occurs due diligence is taken to discuss the best housing situation for the inmate and the facility. This has reduced the availability of items used for self directed violence (SDV) especially by those on suicide precautions. Currently the Lt. Col. is at the Corrections Academy. He was required to attend the Academy as a part of his job qualifications. He will return full time to HRRJ in January.

Lt. Ponds, Agreement Coordinator, (Substantial Provision 152) has been forwarding the required Relevant aggregate data (Substantial Provision 121, a 1 - 29) to the Monitor and United States Department of Justice (USDOJ) monthly. While challenges with the formatting and access to the data continue, most of the data is available monthly. Data from the reports are reviewed while on-site.

The security consultant continues to provide services to the HRRJ and has been on site all but one month during this period. He meets with security staff advising on policies, procedures, post orders, etc. He also meets with staff discussing alternative strategies to meet the shortage of jail officers in the facility. Over the past six (6) months he has worked with HRRJ security staff revising policies to address the substantive provisions of the Agreement. He has conducted interviews with inmates and staff and observed security operations from each of the active units in the facility.

A Restrictive Housing (RH) consultant visited the facility in June to advise HRRJ on RH issues related to the Agreement. Specific items related to RH were discussed during the out-briefing conducted after the visit. These have been incorporated into the advice provided to HRRJ on an ongoing basis and in this report.

## Substantive Provisions

### Policies and Procedures

19.     Within six months of the Effective date, the jail will consult with the Monitor to draft and/or revise policies and procedures to incorporate and align them with the provisions in this Agreement - During the first six months of the Agreement HRRJ has submitted ninety-eight (98) policies for review. Eleven (11) of those policies were specifically related to the substantive provisions of the Agreement. Ten of them were healthcare policies the other was a general security policy. Of the ten (10) health care policies, seven (7) were approved without additional changes, three (3) have been returned for additional review by HRRJ/Wellpath and were changed accordingly. One general security policy was approved as well. Meetings with medical administrative staff were held to coordinate policies to assure they are consistent. An Officer was assigned to supervise the preparation and revision of the Jail's Security Policies and Procedures. A team of officers has been organized to begin the review process of the appropriate Policies and Procedures. In addition to the eleven (11) substantive policies, the Monitor and the United States have approved Ten (10) security policies and two (2) were returned for review with suggested changes. At present, HRRJ staff are meeting weekly to discuss the various policies.

   It will be critical for HRRJ to continue to work diligently with regards to security policy generation for the institution to move forward with the changes that are necessary to comply with the Agreement and achieve substantial compliance. They need to work harder to use the security consultant to assist with the development of policies and procedures.

   *HRRJ is partially compliant with this provision.*

20.     Policies approved will be adopted – Approved policies and procedures have begun to be adopted and training on those has commenced. The Monitor and HRRJ prioritized polices needing to be completed as soon as possible. The healthcare policies were the first to be completed. The security policies are being worked on currently with the Monitor's security consultant.

As noted above, it will be critical for HRRJ to continue working quickly with drafting security policies to assure consistency with healthcare policies approved by the Monitor and the USDOJ.

*HRRJ is partially compliant with this provision*

21.     Begin Implementing policies approved - HRRJ has three (3) months after approval to begin implementing the approved policies.  - HRRJ has begun the process of training and implementing approved policies. The training plan has been developed by HRRJ security and healthcare administrations and is being implemented as soon as policies are approved. Documentation was available for review by the Monitor as training activities are ongoing.

Keeping track of the policies approved, training and implementation continues to be critical. HRRJ will need to assure that all staff are included in training activities and participant lists updated on a regular basis.

*HRRJ is partially compliant with this provision*

22.     Fully implemented policies - HRRJ has six (6) months to fully implement policies after approval. HRRJ is on track to implement policies which have been approved by the monitor and the United States. Tracking will continue to be critical to assure that all staff are trained as each policy is implemented. This will be an ongoing process as new or revised policies are approved.

Keeping track of the policies approved and implementation of them will be critical. HRRJ will need to assure that all staff are included in training activities and participant lists updated on a regular basis.

*HRRJ is partially compliant with this provision*

23.     Annual policy review - Annual review of policies developed is required. As there were no policies which have been in effect for the entire one-year period this provision will be evaluated during the next 6-month cycle.

HRRJ will need to assure that all policies approved are reviewed each year. Tracking mechanisms must be put in place to assure compliance with this provision.

*This item will be referenced in the Summary of Compliance Table as NR, Not Rated*

**Staffing Plan**

24.     Staffing plan development - Staffing plans were submitted to the Monitor and USDOJ within four (4) months of the effective date of the Agreement, however updated plans are still in development. A Zoom call was held on November 16, 2021, to provide the most recent staffing plans. There was much discussion regarding what was expected, the current strategy of HRRJ and their plans for the future. A draft example of how the current HRRJ employees are identified was sent to the United States on November 17, 2021. It will be important for all sides to specifically identify the expectations in order to HRRJ to provide what is desired. HRRJ will need to continue to assure the monitor and United States the plans are comprehensive, addressing both the security and healthcare concerns/needs of the institution. The new plans should address current changes in consolidation of housing units and inmates. Mandatory posts for security have been reduced due to reduction in ADP therefore changes in the security staffing plan was necessary. Recruitment activities are ongoing at job fairs, postings on the internet, and so on, however, the pool of candidates remains minimal. As noted in the First Monitor Report, the HRRJ Jail Board must look at the salary structure for the facility and assure that it is competitive with surrounding correctional and other facilities. There are currently sixty-eight (68) security vacancies at the facility as of October 31, 2021.

For medical and behavioral health, a draft matrix has been created. HRRJ must approve the revised medical staff matrix to assure that medical and behavioral health care can be provided as per the Agreement and National Commission on Correctional Health Care/American Correctional Association (NCCHC/ACA) standards. The amended contract must assure that there is flexibility to increase staffing, as needed, relative to any increase in the ADP or opening of mental health units. Wellpath must review salaries for all healthcare staff. It is critical to recruitment efforts that this analysis occur quickly. In October it was announced that the Health Services Administrator (HSA) is to be replaced. It was

announced that a new HSA is to begin on December 6, 2021. The Director of Nurses (DON) is out on FMLA. Currently there is an interim DON until the current DON returns to work. It is critical for Wellpath to hire and needed replacements post haste. A quick turnover will assist HRRJ in assuring that achievements are not lost in any transition of staff.

In order to achieve and maintain substantial compliance, vacancies for Registered Nurses, Behavioral Health professionals and security/civilian staff must be a recruitment priority. Additional recruitment activities and review of salary structure must occur to assure that HRRJ salaries are competitive with surrounding correctional and other facilities. Retention of staff will be an important factor in the ability of HRRJ to continue to improve and sustain the positive movement forward which has been made up to this point.

*HRRJ is partially compliant with this provision.*

25.    Staffing Plan Implementation - HRRJ had one year from the date of submission of their plan to fully implement this provision. The current challenge is that the ADP has significantly changed. This change, and the closing of one unit in the facility has caused a shifting of staff. As noted above, HRRJ has a current plan, however, as the ADP changes and the anticipated future opening of mental health units occurs, this will be a continuing work in progress. At the November 16, 2021, Zoom call it was agreed that HRRJ will provide to the Monitor and United States a monthly update as to the current numbers of on-site staff and vacancies. They will also provide the plans for the future as the ADP increases and opening of the mental health units commences. Initial documents were sent to the Monitor and the United States on November 17, 2021.

HRRJ must provide the above documents on a consistent basis to continue to be partially compliant with the provision. Final plans must be submitted as all the mental health units are opened and staffing plans approved to obtain substantial compliance. Flexibility with the plans will be critical.

*HRRJ is partially compliant with this provision*

**Training**

26.    Pre- Service and Annual in-service training - A Comprehensive Annual Training Plan has been developed and is being implemented for the Jail, which includes Orientation for sworn officers, Suicide Prevention, Basic Training for new officers, and assignment to a Field Training Officer (FTO) when they have completed orientation and In-service and Field training on continuous bases.  Training has been increased to provide training in Mental Health, First Aid, and Crisis Intervention training.  The Training Plan includes the dates and times of scheduled training for 2021. The training plan uses competency-based adult learning techniques. Review of rosters shows all incoming staff are being trained and all current staff are being trained according to the annual schedule. Two hundred and ninety-one (291) staff have been CPR trained.

Training on the new policies, procedures and changes to daily operation must be provided as soon as the policies and procedures are approved to assure rapid implementation. Continued tracking of this training is important.

*HRRJ is partially compliant with this provision.*

27.     Incorporate Agreement requirements into the training curriculum - The Monitor and security consultant continue to meet with training officers to review the annual training plan, type, length, and times of training. HRRJ has followed suggestions made and is incorporating relevant Agreement requirements into their training activities.

HRRJ training staff must be vigilant to assure that any changes to policy, procedure, post duties, inmate treatment strategies are incorporated into the training curriculum. Review by the Monitor and USDOJ will be important to assure that all training activities are consistent with the Agreement.

*HRRJ is partially compliant with this provision.*

28.     Annual In-service training - HRRJ has six (6) months after new policies have been approved to provide training on those policies. And eighteen (18) months after the effective date of the Agreement. - As new policies are approved, training staff have begun to incorporate these items into the existing training activities. Rosters were reviewed and training is occurring on new policies. Annual in-service training is occurring and has begun to incorporate the new policies into that training activity.

Training and changes to the training curriculum will be ongoing. It will be important for training staff to be vigilant with keeping up with any and all changes to policies and daily operations of the institution.

*HRRJ is partially compliant with this provision*

29.     Training on mental health care - Training on mental health care, suicide prevention is occurring monthly using evidence-based standards. New staff are trained prior to being placed at their posts. Yearly in-service training is scheduled and being conducted to assure each security and healthcare staff member are up to date with the training requirement. De-escalation technique training is ready to be provided, but due to behavioral health staffing has not yet been implemented. 100% of medical and behavioral health staff have completed mental health training as required in the Agreement. 100% of new employees have completed required mental health training prior to post assignment. Annual training is ongoing, there were no current employees whose required training is behind schedule.

De-escalation training will be critical to improving the functioning of the institution. Development of the training and implementation of that training will require support from HRRJ security and healthcare administration. Ongoing evidence-based training will require revision to the curriculum as standards and practice within the correctional environment changes.

*HRRJ is partially compliant with this provision.*

**Security**

30.     Security Staffing - Security staffing has been a challenge during COVID - 19. Previously, this had caused delays in medication delivery and full access to medical and behavioral health activities. During this six (6) month period, there were no instances during site visits where delays were observed. A concerted effort has been made by HRRJ security staff to assure that jail officers are available and present during pill pass, sick call, mental health rounds and medical emergencies. One area that will need some work is the ability of the behavioral health staff to take the inmate on suicide watch out of

their cell for a private conversation. During site visits it was observed that this was not always possible due to the lack of security staff, especially on weekends and holidays.

It will be important for HRRJ to continue their efforts in recruitment and retention. As noted previously, the HRRJ Board must look at the salaries of sworn officers to assure that they are competitive with the surrounding jails and the community. This will help in both recruitment and retention of officers. Incentives for sworn officers who have been employed for over fifteen (15) years has improved morale with those officers who have stuck with HRRJ, especially during the crisis of COVID - 19. Newly approved incentives for civilian employees will help to thank those employees who have stuck with HRRJ during this time.

The average daily population of HRRJ has hovered at approximately four hundred (400) inmates daily since the return of some inmates to feeder jails. The returning of inmates has in turn caused a reduction of mandatory posts thereby enhancing the number of officers available for reallocation within the facility. And the conversion of some security positions to a civilian has also helped HRRJ to better address the sworn officer shortage. Positions converted include but are not limited to master control operators, records clerks, and maintenance technicians. Six (6) of sixteen (16) pods are closed which has reduced posts needing to be staffed from twenty-three (23) to eighteen (18). Housing unit 2 is closed.

While the closing of housing unit two and the reduction in ADP has helped to alleviate some of the stress on the institution and its sworn officers, HRRJ administration will need to be ever vigilant with recruitment, retention, training, and oversight to assure the safety and security of the institution. Past events have shown that this is a constant requirement in a correctional setting. You may never let your guard down.

*HRRJ is partially compliant with this provision.*


## Medical and Mental Health Care

31.    Medical and Mental Health Prior Records – Out of the forty-four (44) intake records reviewed, there were no admissions where the feeder jails had not provided medical records. Feeder jails fax information to HRRJ 24 hours prior to the inmate being transferred to the facility. At the morning meeting of all healthcare and security staff (called the Whiteboard meeting) all admissions are discussed to assure that information is shared with all staff prior to the arrival of the inmate. During the initial stages of the Agreement, there were times when feeder jails provided incomplete information. During admission intake procedures when an outside provider is identified, whether medical or behavioral health, intake staff receive a release of information (ROI) permission form from the inmate to acquire appropriate records.

To assure continued substantial compliance with this provision, there must be constant communication with feeder jails to assure that medical and behavioral health records are included with the transfer of inmates is ongoing. It will require immediate discussion with HRRJ and feeder jail administration to assure that essential documents are included with the transfer.

*HRRJ is substantially compliant with this provision*

32.     Feeder Jail medical records - As noted above, there were no instances where information was not obtained from the feeder jail. Observation of intakes during site visits and review of forty-four (44) intake records showed that all met the Agreement standard of assuring that pertinent information is incorporated into the inmates' medical and mental health charts.

<u>To assure continued substantial compliance with this provision, there must be constant communication with feeder jails to assure that medical and behavioral health records are included with the transfer of inmates is ongoing. It will require immediate discussion with HRRJ and feeder jail administration to assure that essential documents are included with the transfer. It will be critical that all information obtained from the feeder jails is incorporated into the HRRJ medical record system.</u>

*HRRJ is substantially compliant with this provision.*

33.     Continue Medications - Review of forty-four (44) intake records showed that all inmates who had medications noted during the intake procedure had been ordered. Provider staff were available for consultation reviewing all orders to assure medication continuation.  All inmates received from feeder jails have had medical information present. It is important for those feeder jails to continue this improved practice to assure continuity of care.

<u>In order to assure continued substantial compliance with this provision intake nurses must be vigilant to assure that all information is received with medications noted and ordered to assure continuity of care for those inmates received from feeder jails.</u>

*HRRJ is substantially compliant with this provision.*

34.     Medical or Mental Health Request/Sick Call Process - The sick call process was reviewed during each on site visit. The sick call process continues to be a work in progress. Out of sixty-three (63) records reviewed all had been seen in the required time frame. A challenge was that some of those was due to pure chance and the presence of provider staff on site, not to the process. Documentation was inconsistent at times and not available in ERMA. Chart records had to be reviewed to assure that the sick call was completed. Security and healthcare staff recognized that there were inconsistencies in the process and changes were needed. The new interim HSA who started in October is revamping the process to assure it is clear to all staff. The nurse trainer is working to assure that all staff understand and follow the new process. If any of the changes impact inmates, security and health care staff will need to assure the Monitor and United States that written and verbal communication to all inmates has occurred.

Inconsistent delivery of mental health sick call slips showed this as a problem. Fifty-five (55) mental health sick calls were reviewed. While mental health staff have been vigilant in seeing inmates on their treatment rosters, sick call slips reviewed showed some had not been delivered from nursing staff to mental health staff in a timely manner, or not at all. Again, it was happenstance that inmates requesting mental health sick call were seen in a timely manner. The slips themselves were not always available for mental health staff to review. Paper mental health sick call slips were not delivered to the collection boxes stationed next to the mental health offices. Electronic submissions were delivered and acted on promptly by mental health staff.

Deficiencies noted in medical sick call slips were the lack of nursing notes using the agreed upon process and procedure. During a sick call, a Nursing Documentation Pathway (NDP)/Nursing Assessment Protocols (NAP) should be used to allow access to data and follow nursing protocols. Policy

E - 08. Some of the records reviewed did not utilize this process and it was difficult to follow what actions were taken during the appointment. Also, it will be important to assure that only Registered Nurses (RN) provide sick call assessment. According to the revised sick call process implementation schedule, all staff were trained in the new process by November 8, 2021, implementation of the new process occurred on November 15, 2021.

Recruitment and retention of RN's must be a priority to assure that sick call services are provided by a Registered Nurse. Training for those responsible to pick up sick call slips during pill pass must continue to be a priority. Nursing administration must constantly review implementation of the new process to assure that all staff are following the new procedure.

*HRRJ is partially compliant with this provision.*

35. Sick Call Collection - During pill pass collection of sick call slips was observed. All inmates have access to health care staff at least twice a day during pill pass. Even those who may be in a Restricted Housing (RH) unit have access to pill pass staff. The process for collection of the sick call slips has not changed, however, what those pill pass staff do with them after collection has changed. It will be important for each pill pass staff to follow the new process for depositing the slips into the proper bins for triage.

It will be critical to assure that all staff follow the new process AND, that information on any changes to the process that affects inmates' ability to access sick call be clear to all inmates in the facility. It is imperative that Wellpath and security staff provide verbal and written information to all inmates to assure they understand any changes to the way to access medical and behavioral health services. Training to all in the facility will be critical.

*HRRJ is partially compliant with this provision.*

36.     Sick Call Triage - Review of the sixty-three (63) medical sick call records showed an inconsistency with the timing of triage, and some were not triaged at all, however all inmates submitting sick call slips had been seen by a nurse or referred directly to a provider. Fifty-eight (58) out of the total of 63 were complete, this gives an overall score of ninety two percent (92%). This was also the case for the behavioral health records also as some were not completed by the triage nurse and just sent to be seen by behavioral health staff. All inmates were seen by appropriate staff. When triage occurred, it was completed by an RN. Emergent, Urgent, and Routine was noted on those sick call slips which had been triaged. According to the revised sick call process implementation schedule, all staff were trained in the new process by November 8, 2021, implementation of the new process occurred on November 15, 2021.

As noted in #34 above there is a new process which is being implemented. It will be critical for Wellpath administration to review the data to assure the process is followed. Clinic RN staff need to review and triage **all** sick call slips. While it was noted that all inmates had been seen within 24 hours, it was not clear the degree of criticality of the sick call. Therefore, urgent or emergent issues may not have been addressed in a timely manner.

*HRRJ is partially compliant with this provision.*

37.     Sick Call Tracking – Not all elements of the logging and tracking system are available on the tracking log reviewed. The new process and tracking log being implemented on November 15, 2021,

includes all the required elements. Review of the previous log showed that there were inconsistencies for some of the elements. As this is a work in progress and there is a new system being implemented, an overall score was not available. Auditing of the process by the DON, Medical Director and Wellpath administrative staff will help to ensure that all staff complete the log as required.

A daily review of the logging and tracking system for sick call must occur to assure that staff fully implement the process. Over time, weekly tracking and then intermittent review of the process will be necessary.

*HRRJ is partially compliant with this provision.*

38.      Sick Call Oversight - As the new system is put in place oversight by Wellpath administrative nursing and medical staff will be critical. Oversight was inconsistent over the past six (6) months.

It will be important for the Medical Director, Director of Nurses and Wellpath administrative staff to assure oversight is completed as necessary for compliance with the Agreement and NCCHC/ACA standards. Protocols have been approved by Wellpath national Nursing/Medical staff.

*HRRJ is partially compliant with this provision.*


**Medical Care**

39.      Constitutionally adequate medical care. HRRJ will need to be substantially compliant with provisions 40 - 58.

As noted above, HRRJ will need to be substantially compliant with provisions 40 – 58 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with medical care component of the Agreement. No grade will be given at this time. Pending Review, PR.*


40.      Medical Staffing – There has been Medical (physician and nurse practitioner) provider coverage on days, evenings, and weekends since April 24, 2021. Prior to this time coverage was not consistently available in the evening and on weekends. With the change in ADP HRRJ security staff is available to escort inmates to and from appointments in the clinical areas and provide escorts for sick call. The additional staff allows coverage and assures there is a medical provider on site 7 days a week.  Provider coverage does run into the early evening hours. There were times when a provider was not available due to vacation or other reason. Wellpath must plan in advance, especially for known time off by provider staff. There are currently three (3) RN vacancies, one (1) CMT (Certified Medication Technician) vacancy and one (1) HSA vacancy. The RN vacancies has created a situation where some RNs need to work overtime to fil in, and some PRN staff is being used. Currently the DON is out on FMLA. Wellpath has provided an Interim DON until the DON returns from FMLA. Also, during this six (6) month review the dentist was out FMLA, Wellpath provided a fill-in Dentist to assure there were no backlogs in dental care. Once the RN vacancies are filled the current staff is adequate for the reduced ADP. However, when the ADP increases, and the new mental health units are set to open additional medical staff will be needed to assure that all areas of the Agreement are addressed.

Wellpath must assure that medical provider coverage continues later in the day into the evenings and on weekends to be substantially compliant with this provision. Wellpath must assure that provider staff is available to cover vacations and other times when the usual staff are off for whatever reason. Recruitment for RN staff is important for HRRJ to move toward substantial compliance with this provision. HRRJ security must assure that escort is provided to all health care staff to assure safety and security.

*HRRJ is partially compliant with this provision.*

41.     Medical Intake - On site review of forty-four (44) intake records showed a one hundred percent (100%) completion of medical intake screening. No records had any items missing. An RN completed all medical screenings reviewed. The screening is conducted in a confidential setting and the intake screening is completed in the electronic health record.

Intake nurses must be vigilant to assure that this standard continues to be implemented to sustain substantial compliance.

*HRRJ is substantially compliant with this provision*

42.     Medical screening factors - As noted above out of the forty-four (44) records reviewed there were no missing components in any of the reviewed records. All components of the Agreement as noted in this item were present in all the records reviewed.

Intake nurses must be vigilant to assure that this standard continues to be implemented to sustain substantial compliance. It will be important for Wellpath administration to cross train additional RNs to assure that intake continues to be substantially compliant when the usual intake nurse(s) is on vacation or off for any other reason.

*HRRJ is substantially compliant with this provision.*

43.     Medical Assessments - As a routine HRRJ conducts the medical assessment during the intake process or within one day of admission. Chart review of forty-four (44) found none that did not have a routine medical assessment completed either on admission or within one day of admission. When there is not an NP available the assessment was delayed by one day, but still met the Agreement and NCCHC/ACA criteria.  The sick call process as noted in #s 34 – 38 is being revised, however review sixty-three (63) of the sick call records did show that when noted in the tracking log (they were not always noted) emergent, urgent and routine assessments were completed in the required timeframe.

HRRJ will need to be substantially compliant with provisions 43 – 47 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with medical care assessment component of the Agreement. No grade will be given at this time.  Pending Review, PR.*

44.     Emergent Medical Assessments - The assessments are based on Policy E - 02 Receiving Screening and E - 08 Nursing Assessment Protocols (NAP). As this substantive provision addresses both intake and sick call, I will address them separately. An intake assessment by a NP is to be completed on

all inmates being admitted into the facility according to the above policy. During this six (6) month period there were two (2) assessments which were conducted within twenty-four (24) hours, but not according to the above policy. None of the intake assessments were emergent or urgent from notes that were written in the patient chart. Since every admission into the facility is seen by a nurse practitioner, the emergent and urgent classifications are not used in this context. Admissions are from feeder jails. Each of those individuals has been in another facility for at least seven (7) to fourteen (14) days. There have not been any instances noted in the patient records in the past year where an admission to the facility has been in an emergent or urgent situation. Those returning from an outside appointment are seen by an RN. Those retuning from the hospital are also seen by an RN and a provider prior to being placed in a housing unit. For sick call, as was noted in #'s 34 – 38 above the sick call process is currently being revised to assure the entire process addresses all items in the Agreement. Reviewing patient records, security logbooks and clinic notes all emergent calls to the medical area are dealt with immediately. Security policies allow for a jail officer to contact medical at any time they feel it is needed to care for an inmate. Observation over the past year has shown that jail officers are aware of and call medical when they notice any medical or mental health issues with an inmate. The challenge here is tracking those that may be sent to medical due to an emergent or urgent issue. Emergent Medical Assessments identified through the sick call process need to be tracked in a manner where it will be easier to identify them as Emergent.

<u>Wellpath administrative staff will need to strengthen the sick call process to specifically identify emergent medical referrals. It will be important to track these referrals to assure compliance.</u>

*HRRJ is partially compliant with this provision.*

45.     Urgent Medical Assessments - As noted above assessments are based on Policy E - 02 and E - 08. Data is the same. There were no urgent medical assessments that were not addressed during intake, however tracking through the sick call process was difficult. The new revised process should alleviate this issue. Assessments identified through the sick call process need to be tracked in a manner where it will be easier to identify them as Urgent.

<u>Wellpath administrative staff will need to strengthen the sick call process to specifically identify urgent medical referrals. It will be important to track these referrals to assure compliance.</u>

*HRRJ is partially compliant with this provision.*

46.     Routine Medical Assessments (Intake) - Intake screening assessments are to be completed by a NP during the admission process. Intake assessment by a NP is to be completed on all inmates being admitted into the facility. There were two that were completed within twenty-four (24) hours from admission. All intakes were routine. As noted above and in #s 34 – 38 above the sick call process is being revised.

<u>The retention of Nurse Practitioners to assure their availability to provide this valuable service is critical for HRRJ to stay in compliance with this provision.</u>

*HRRJ is partially compliant with this provision as there were two times when a NP or physician staff were not available to conduct this assessment at time of intake.*

47.     Routine Medical Assessments (Sick Call) - Of the sixty-three (63) sick call assessments that were completed sixty (60) were routine and all were seen in the required 72-hour time frame. Most were seen fifty-eight (58) within 24 hours. Tracking and completion of sick calls following the Nursing Pathways must be followed. As noted in #34 above, there is a new system to assure that sick call slips are picked up and deposited into the correct bin for triage and follow up.

    Recruitment and retention of RN's must be a priority to assure that sick call services are provided by a Registered Nurse. Wellpath will have to work to assure that the new system for sick call is fully implemented and oversight is conducted on a timely basis.

    *HRRJ is partially compliant with this provision.*

48.     Acute Care - Review of charts and discussions with security, nursing, behavioral health, inmate interviews and provider staff indicate there were no instances where an inmate identified was not seen immediately for a serious acute need.  HRRJ policy number seventeen point two (17.2)  states – "All sworn staff have the authority to contact medical concerning an inmate's illness or missed medication without having to obtain permission from supervisory staff first", "If sworn staff feel an inmate(s) is having a life threatening emergency do not hesitate to call a code 10-52" and, If the inmate(s) medical condition is serious but not an emergency, staff have the authority to take the inmate to medical without seeking permission from supervisory staff first. Once in main medical or housing unit clinics inform your immediate supervisor, and an incident report must be completed." Review during subsequent visits will continue to verify this provision. However, tracking of this item is not consistent.

    Tracking by security of instances where an officer or health care provider identifies the need for acute intervention by health care staff will be critical for assuring this provision is carried out. Mental health tracking is occurring. Incident reports track the situation, however, how to specifically track medical or psychiatric incident reports needs to be enhanced. A mechanism is available through the Jail Management System (JMS), but it is not tracked by all staff. HRRJ must make this a priority to be able to track all incidents where HRRJ security staff request acute care services from healthcare provider staff.

    *HRRJ is partially compliant with this provision.*

49.     Chronic care - All inmates are seen for an assessment for chronic care during the intake process. There was a short period during the past year where this was not the case due to staffing shortages. The chronic care clinical evaluation is usually conducted by a NP. Chart review of intake screenings from May - October 2021, found two (2) out of 25 that did not have a routine medical assessment/chronic care visit completed on intake.

    Wellpath must assure availability of Physician and Nurse Practitioner staff to provide this valuable service as it is critical for HRRJ to stay in compliance with this provision.

    *HRRJ is partially compliant with this provision.*

50.     Chronic Care Registry - Over the 6-month initial period of the Agreement there have been three different chronic care nurses assigned to the position. Review of sixty-one (61) charts on the registry with the newest chronic care nurse found the process had identified all patients on the chronic care registry, diagnosis, date of last visit and date for the next visit. However, there were discrepancies

between what was written in the provider order and what was then followed regarding scheduling, laboratory orders. Over the next few months, it is anticipated that the current chronic care nurse will be able to refine the process and assure that all items in the Agreement are met. The challenge for provider staff is training and coordinating services for chronic care patients with so many staff changes. The chronic care nurse, providers and Medical Director must all be on the same page with regards to scheduling follow up appointments, labs, etc. The process needs to be clear for all involved to assure continuity of service delivery.

Retention of a staff member to serve in the chronic care capacity to track and identify trends, assure orders are followed and follow up visits scheduled is critical for HRRJ to stay in compliance with this provision.

*HRRJ is partially compliant with this provision.*

51.     Chronic Care Plan of Care - Review of sixty-one (61) charts in the registry found that all patients had a plan of care. Review of the charts also found some inconsistencies between providers when identifying degree of control and consistency with providers orders for when to return for a follow up appointment. Continuity of chronic care nursing staff is needed to assure that all staff follow the same criteria when identifying degree of chronic care control and scheduling follow up visits to a chronic care appointment.

Retention of a staff member to serve in the chronic care capacity to track and identify trends, assure orders are followed and follow up visits scheduled is critical for HRRJ to stay in compliance with this provision.

*HRRJ is partially compliant with this provision.*

52.     Chronic Care Protocol - Review of the sixty-one (61) charts found that as noted above not all providers were using the same criteria and follow up visits based on their assessment of whether their condition was "poor", "fair" or "good". There needs to be consistency to assure all staff follow the same protocol.

Wellpath will need to assure that all providers are following the same criteria when identifying the degree of control related to the identified chronic condition. A consistent chronic care nurse that will follow up with the Medical Director to assure continuity of care.

*HRRJ is partially compliant with this provision.*

53.     Medical Diagnosis - Review of charts in; intake forty-four (44), chronic care sixty-one (61), sick call sixty-three (63) found all had diagnosis for identified medical problems. A problem list was present in all charts reviewed where a medical condition was diagnosed. Patient education activities were noted in the charts.

Routine random chart review by health care administrative staff will assure that HRRJ stays in compliance with this provision.

*HRRJ is substantially compliant with this provision.*

54.    Medical Specialist Appointments - There is an identified healthcare staff member responsible for scheduling medical specialty appointments. The spread sheet (specialty appointment registry - offsite appointment registry) was reviewed at each on site visit.

 HRRJ will need to be substantially compliant with provisions 54 – 58 to obtain substantial compliance with this overall provision.

 *HRRJ must meet all the below criteria to become compliant with medical specialist appointments of the Agreement. No grade will be given at this time. Pending Review, PR.*

55.    Medical Specialist Registry – There is a medical specialist registry, and the registry is up to date and contains all the required elements. The Medical Director has developed a system to review the registry to assure there are no delays in care. Tracking for any urgent referrals is present. The registry identifies the reason for a delay, if it occurs, and the health care provider creates a note in the chart identifying if the delay is acceptable or if the patient needs to be seen in an expedited manner. There were no delays noted over the past six (6) month period. On site providers are required to write a note in the chart if there is a delay of more than 30 days.

 The Medical Director has developed a mechanism for review and follow up of the medical specialist registry to assure that time frames are consistent with the Agreement. This must be followed to assure continued substantial compliance with this provision.

 *HRRJ is substantially compliant with this provision.*

56.    Medical Follow-up care - On return from an outside appointment, patients are brought to the clinic area and vital signs are taken and documents received from the outside provider are reviewed. The documentation is then forwarded to the on-site provider who reviews the information and creates a note related to the outside providers assessment of the patient. Review of twenty-five (25) records over the course of the six (6) month period showed an eighty-eight percent (88%) completion rate similar to the last monitor report. On one (1) chart vital signs were not available, and on two (2) charts it was unclear if there was a provider note. Systems were developed over the last review period to assure that the patient is to be seen on return and documentation is given to the provider for follow up. There was no patient who was not seen, documentation is the issue, not direct patient care.

 All RNs identified as the intake or charge nurse must follow the agreed upon procedure for follow up of all patients who return from outside appointments and hospital stays and ensure documentation of review of outside documents is in the chart.

 *HRRJ is partially compliant with this provision.*

57.    Medical Treatment Plans - As noted above, Review of charts in; intake forty-four (44), chronic care sixty-one (61), sick call sixty-three (63) found all had treatment plans which track active problems. A problem list was present in all charts reviewed where a medical condition was diagnosed. Patient education activities were noted in the charts.

 Routine random chart review by health care administrative staff will assure that HRRJ stays in compliance with this provision.

*HRRJ is substantial compliant with this provision.*

58.    Medical Treatment - Currently inmates are scheduled for chronic care, labs, wound care, finger sticks for diabetes, EKG's and other testing. The electronic medical record system ERMA tracks when patients are scheduled for medical treatment, and when it has been completed. Although both the medical orders and the scheduling for those orders are in ERMA, there is no linkage that checks back to mark all items in medical orders as completed.

HRRJ needs to develop a tracking mechanism to assure that all medical provider "orders" are transcribed from the "order" to the scheduling portion of ERMA. This will assure that no medical orders were incomplete.

*HRRJ is partially compliant with this provision.*

**Mental Health Care**

59. HRRJ is to provide constitutionally adequate mental health care.

HRRJ will need to be substantially compliant with provisions 59 – 99 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with mental health care component of the Agreement. No grade will be given at this time. Pending Review, PR.*

60.    Mental Health Staffing - The current staffing level provides care seven days a week. Qualified Mental Health Providers (QMHP) are available seven days per week. Tele-psychiatry services are available. There are four (4) Psychiatrists providing fifty-six (56) hours of tele psych services per month. There is a Psychiatric Nurse Practitioner who provides 32 hours on site services per week. These services are provided over the weekend into the beginning of the week. This provides seven (7) day a week coverage along with the weekend coverage required in the Agreement. It is noted that under #80 below psychiatry staffing allows for the two weeks turn around for those patients who have had a medication change. A Psych RN was recently hired to supplement the mental health staff at the facility. There are currently one point four five (1.45) vacancies for QMHP staff. Psychiatry staffing is adequate due to the reduced ADP, however, the challenge for the current QMHP staff is that they have never been fully staffed and many times must do double duty, as does the mental health director. The Monitor has requested an increase of one QMHP to the current mental health staffing plan which was accepted by HRRJ. Once the last of the QMHP staff are hired a full examination of the staffing must occur to assure adequate staffing. The current staffing does not include the staff needed to open mental health units at the facility. That will require additional QMHP, psych tech and security staff to assure safety, security, and adequate treatment.

HRRJ will need to enhance their recruitment and retention activities to assure that adequate staff are available to meet the needs of those inmates with mental health conditions, especially as they open up mental health units as required in the Agreement.

*HRRJ is partially compliant with this provision.*

61.    Mental Health Intake - Mental Health intake was reviewed at each on site visit during this monitoring period. Forty-four (44) charts were reviewed. All had a mental health intake screen completed. Notes were included in each chart; all elements of the Agreement were included in the intake process. The policy and process are in place.

   <u>HRRJ will need to work diligently to keep up with this provision as the pressure to do more with its patients increases. This is a great start as all intakes get an individual intake in a confidential setting.</u>

*HRRJ is substantially compliant with this provision.*

62.    Mental Health Screening Factors – All the mental health screening factors required in the Agreement are included in the intake screening document. The process is in place and the policy has been approved.

   <u>During this reporting period a previous item regarding "observations by the transporting officer" that was not being completed, has been observed and documented currently in the notes by intake staff. It will be critical that this continues to assure a substantial compliance rating.</u>

*HRRJ is substantially compliant with this provision.*

63.    Mental Health Assessments - Mental Health assessments were reviewed at each on site visit. Forty-four (44) charts were reviewed. All had a mental health assessment completed at intake. Notes were included in each chart; all elements of the Agreement were included in the assessment. The process and policy are approved and in place. During on-site visits I was able to observe ten (10) intake processes. Communication between intake nursing staff, QMHP, security staff and patient were observed and critical to the process.

   <u>As noted above, communication from officers to staff has significantly improved, it will be critical for mental health staff to continue to ask the officers if they observed or have any information that may help in the assessment process. This is a strategy that will help staff with the assessment and assure continued substantial compliance with this provision.</u>

*HRRJ is substantially compliant with this provision.*

64.    Emergent Mental Health Assessments - Mental Health referral process was updated, and referral criteria was identified during the last reporting period. Temporary Detention Orders (TDO) are being utilized and since January 2021 all twenty (20) TDO's submitted for action have been approved. The rate of acceptance for TDO's in 2020 was ninety-two percent (92%). This shows that HRRJ mental health staff are assessing and evaluating the need for a TDO appropriately and correctly using that process to the advantage of inmates. Inmates who express suicidal ideation or harm are immediately referred for mental health follow up by a QMHP by a phone call to mental health. Suicide prevention training outlines the criteria for emergent, urgent, and routine referrals to MH staff. In the absence of on-site MH staff, all emergent referrals to MH are seen by the charge nurse. For all emergent referrals the charge nurse submits an electronic emergent referral in ERMA and calls the MH Director via phone

when MH is not onsite. All twenty (20) TDO referrals were reviewed for authentication of the system. Tracking is occurring and all were noted in the log. There is also a referral process through the JMS as noted in 48 above. Twelve (12) emergent (non TDO) referrals through electronic or phone call were reviewed all were documented and tracked. There was no incident noted where an emergent inmate referral was not seen, or a referral lost.

Tracking of referrals will be an ongoing challenge, especially as the ADP increases and additional burdens are placed on the behavioral health system. It will be important to continue to track this to show the thoroughness of the process.

*HRRJ is substantially compliant with this provision.*

65.    Urgent Mental Health Assessments - As noted above a referral process and criteria was identified and is in place. Eleven (11) urgent mental health assessments were reviewed. A mental health assessment by a QMHP is part of the referral process. Tracking log of the referral process is present. The four (4) criteria required in the Agreement is part of the assessment process and is mostly being noted in the patient chart. Tracking the exact time frame for the referral and action taken is showing improvement. Notes by the QMHP do not always address all items required in the Agreement. And, that the assessment by a QMHP showing that it was due to an urgent referral is not always noted. Training on the process is being provided.

Tracking of referrals will be an ongoing challenge. During site visits there was no incident where an inmate was not seen, or a referral lost as far as this Monitor could observe. But it will be important to track this to show the thoroughness of the process.

*HRRJ is partially compliant with the provision.*

66.    Routine Mental Health Assessments (Intake) - As noted in 63 above, all inmates admitted to the facility had a mental health assessment during the intake procedure. During the April visit forty-four (44) charts were reviewed. All had a mental health assessment completed at intake. Notes were included in each chart; all elements of the Agreement were included in the assessment. The process is in place and the policy has recently been approved. During the visit I was able to observe ten (10) intake processes. There was great communication between the nursing intake staff, QMHP staff and custody staff and the patient showed great coordination and consistency.

As noted above, while communication from officers to staff is much improved, it will be critical for mental health staff to continue to ask the officers if they observed or have any information that may help in the assessment process. This is a strategy that will help staff with the assessment.

*HRRJ is substantially compliant with this provision.*

67.    14-Day Mental Health Check-in - All inmates who are NOT assigned to the mental health caseload will be briefly screened within 14 days of being admitted into the facility. Currently, due to COVID isolation and quarantine protocols, all inmates have been seen at least once a week by behavioral health staff and at least twice a day by pill pass staff. Plans are in the works for HRRJ to have a reception unit where all newly admitted inmates will be for at least the first seven (7) days of their admittance into the facility. This will allow for a permanent process to be developed to assure all newly

admitted inmates are seen within the 14-day requirement. A fourteen (14) day logbook has been created to capture the necessary information once the process is implemented.

As the reception unit is initiated, mechanisms to assure compliance with the within 14-day mental health check-in must be included. As COVID – 19 restrictions decrease this provision will stay in partial compliance until the reception unit is created, or a process is in place to assure the 14-day review.

*HRRJ is partially compliant with this provision.*

68.     Routine Mental Health Assessments (Sick Call) - Review of fifty-five (55) sick call slips showed that all had been completed within the required five (5) day period. An issue with sick call slips that was noted in # 36 and #37 was the physical deposit of the sick call slip into the required behavioral sick call box. In addition, RN staff must be vigilant to assure that any mental health identified sick call slips are referred to mental health staff based on the need for an emergent, urgent, or routine basis. An additional challenge for the behavioral health staff is the need for evaluation in a confidential setting. In the restrictive housing area especially, it is difficult to have a confidential session. Not all mental health sessions are conducted in a confidential setting especially on weekends and holidays. The Monitor will continue to work with security to assist HRRJ to help meet that goal of confidentiality.

At times the sick call slip which requests a visit by mental health is not physically deposited in the mental health in box. The newly identified sick call process is to assure that this occurs. Follow up over the next few months by Wellpath administration will be critical. Confidential setting for all encounters needs to be addressed.

*HRRJ is partially compliant with this provision.*

69.     Nature of Mental Health Assessment – Fifty-five (55) mental health assessments were reviewed while on site and all had the required items of the Agreement except for the assessment being conducted in a face-to-face confidential setting. Some assessments, thirty (30) were conducted in a confidential setting adjacent to the main cell area. While others twenty-five (25) were conducted cell side, this was due to the inability of security staff to provide the needed jail officers to assure a confidential setting. The challenge is when the assessment is done in a location where confidentiality is not available such as through the cell door. This does not allow for a true face-to-face encounter in a confidential setting. HRRJ has recently changed procedures to allow for more face-to-face encounters, but not in all areas for all inmates.

Physical plant changes must be a priority to assure that interviews and assessments are conducted in a confidential setting. Providing care in a confidential setting for all encounters needs to be addressed.

*HRRJ is partially compliant with this provision.*

70.     Mental Health Treatment Plans – The jail will assure that appropriate individualized treatment plans are developed for inmate with mental health needs. The initial treatment plan for those inmates with a mental health diagnosis are developed during the admission intake assessment. If during incarceration an inmate develops a MH diagnosis after seeing a psychiatrist, a treatment plan will be created at that time.

<u>HRRJ will need to be compliant with 70 - 74 to obtain substantial compliance with treatment plan section of the Agreement.</u>

*HRRJ must meet all the below criteria to become compliant with mental health treatment plan component of the Agreement. No grade will be given at this time. Pending Review, PR.*

71.     Timing for initial treatment plan - Initial treatment plan development occurs at the time of intake for those with an SMI diagnosis, those on a psychiatric medication and those identified through the initial mental health assessment in need of a mental health treatment plan. All intakes (those with an SMI diagnosis and those without) have an initial intake mental health assessment. If the patient is on a psychiatric medication or has mental health needs an initial treatment plan is created. Ongoing updates are occurring according to the schedule created by the Agreement and Mental Health Director. There were no instances where a treatment plan was not created for those individuals identified as SMI on intake. There were one hundred six (106) records that were reviewed, only two were not incompliance with the required time frame. The two were completed after the review.

<u>HRRJ mental health staff must be diligent regarding follow up and revision of the plan based on current conditions of the patient. QMHP staff must work to assure that all components of the Agreement are present, when appropriate in the treatment plan.</u>

*HRRJ is substantially compliant with this provision.*

72.     Multidisciplinary team treatment plan update - Vacancies in behavioral health, medical and security make it extremely difficult to create and maintain a consistent multidisciplinary treatment team. However, over the past few weeks there have been nineteen (19) SMI individual treatment plans based on the treatment team approach. Patient participation in the treatment plans is required and it is great to note that all 16 had patient involvement. As HRRJ improves staffing it will be possible to continue to meet this requirement. Currently there is a process where QMHP staff work with security staff to initiate Treatment Plans every Wednesday after the ICC meeting. This is a significant improvement.

<u>HRRJ must work to consistently convene multi-disciplinary treatment teams. It will be critical for HRRJ to assure all required staff and inmates are present for the Treatment Plan process</u>

*HRRJ is partially compliant with this provision.*

73.     Requirements for treatment plan - Of the one hundred six (106) treatment plans that were reviewed, all but two had met the appropriate time frame requirements. The treatment plans were thorough, comprehensive, and included most requirements in the Agreement. The plans components were individualized to meet the needs of the inmates.

<u>It will be critical for the behavioral health staff to continue to be vigilant in their creation, revision and execution of the plans. One challenge is the involvement of the patient in the process. It will be critical to work to increase involvement of the patient in the treatment plan process.</u>

*HRRJ is partially compliant with this provision.*

74.     Timing for Treatment plan review – There were one hundred six (106) treatment plans reviewed during this period. Two (2) treatment plans were not up to date in the review conducted in October. This

is a significant improvement from previous months. Over the past few months QMHP staff have been diligent with changing treatment plans based on change in diagnosis, medication, suicide watch and other relevant factors based on sessions with the patient. It will be important to include all relevant areas of the Agreement, when appropriate into the treatment plan. Compliance has been over ninety five percent (95%) for the past six (6) month period.

<u>Tracking and continued follow up is critical to assure that treatment plans are updated according to the Agreement schedule.</u>

*HRRJ is substantially compliant with this provision.*

75.    Mental Health Treatment - HRRJ will provide treatment that adequately addresses their serious mental health needs in a timely and appropriate manner.

<u>HRRJ must meet provisions 75 - 78 in order to obtain substantial compliance with mental health treatment provision.</u>

*HRRJ must meet all the below criteria to become compliant with mental health treatment component of the Agreement. No grade will be given at this time. Pending Review, PR*

76.    Mental Health Therapy - There were one hundred nine (109) individual therapy sessions over the last reporting period. COVID - 19 and lockdowns due to the presence of COVID - 19 has caused a delay in the ability to provide individual counseling sessions and decreased the number of group therapy sessions. QMHP staffing has also caused a delay in implementing more sessions. The CORE clinical therapist is providing individual therapy and group therapy is also being conducted under that contract. Observation during mental health rounds showed that at times a routine "Check" turns into a half hour to 45-minute therapy session. It will be important for the QMHP to note when a therapy session occurs for tracking purposes that identify individual therapy contacts.

<u>As restrictions imposed by COVID-19 subside it will be critical to re-initiate more group and individual counseling sessions. Recruitment and retention of QMHP staff is a priority. As noted in 69 above, HRRJ must review and make plans for the needed physical plant changes to allow for more confidential setting within the facility. It will take time for HRRJ to become substantially compliant with this provision as it requires staff and space to hold both individual and group sessions as clinically indicated.</u>

*HRRJ is partially compliant with this provision.*

77.    Mental Health Inpatient Care - As noted in provision #64 above, Temporary Detention Orders (TDO) are being utilized and since January 2021 all twenty (20th) TDO's submitted for action have been approved. The rate of acceptance for TDO's in 2020 was Ninety-Two percent (92%). The rate this year is one hundred percent (100%). This shows that HRRJ mental health staff are assessing and evaluating the need for a TDO appropriately and correctly using that process to the advantage of inmates.

<u>Continued review of all submissions to see if they are appropriate for the initiation of TDO process will require vigilance by the Mental Health Director and QMHP staff.</u>

*HRRJ is substantially compliant with this provision.*

78. Confidential Mental Health Treatment - The current physical plant and security staffing issues make this difficult at the current time. It will be critical that senior Jail management review the HRRJ floor plan to make changes as necessary to implement this provision. It will be important for the HRRJ Board to support any changes necessary to implement the physical plant changes needed to meet this provision. Some changes have been made to use unused areas within the secure sections of the institution to provide confidentiality. For example, those on suicide watch are now seen in a confidential setting most times to assure that those interviews are conducted in a professional manner. The challenge is during the weekend and holidays when security staffing is light. As the behavioral health staff increases plans are to expand the clinic area to include space for mental health providers to see patients in a confidential setting.

   HRRJ will need to make additional space available to conduct mental health encounters in a confidential setting.

*HRRJ is partially compliant with this provision.*

79. Psychotropic Medications - review of sixty-two (62) charts showed psychotropic medications are ordered in a timely manner. Review of the Medication Administration Record System (MARS) for those patients showed that they were delivered as ordered - unless refused by the patient. On-site review during pill pass showed that medications are delivered to all inmates who are on "lockdown" status, and from observation pill pass staff checked for the correct patient, correct medication, and correct dosage. Previously, HRRJ had a challenge ordering and getting non-formulary medications, however review of the records (62) showed they had improved and are ordering and getting them delivered appropriately. The biggest challenge is re-ordering of prescribed medications. There was one instance on the weekend where a Psychiatric medication had run out. It was ordered by the Clinic Charge RN and delivered by the backup pharmacy. They continue to work on how to assure that this process does not delay treatment for those in need of formulary or non-formulary psychotropic and other prescribed medications. The interim HSA is working on a corrective action process. The psychiatric nurse us currently reviewing all psychiatric medications and has a tracking system to assure compliance.

   Tracking and follow up by the Psychiatric RN needs to be continued. HSA and Wellpath administrative staff, the DON and Clinic Charge RNs need to work to assure that medications are ordered so there is no delay in medication delivery to patients on Psychiatric medications. If a medication has not been reordered properly, it is incumbent that pill pass staff notify the charge RN so the medication may be ordered from the back up pharmacy. Delay in medication delivery is not acceptable. Recruitment and retention of a consistent pool of pill pass and RN staff is needed to assure compliance.

*HRRJ is partially compliant with this provision.*

80.    Psychotropic Medication follow-up - Review of thirty (30) charts where medication changes had occurred showed that two-week follow ups had occurred. All psychiatric providers have been given instructions regarding the need for follow up as required by the Agreement. A system is in place to check on the number of medication changes and methods to assure that follow up is conducted according to the Agreement. Patient lists were produced by appointment, patients were brought down by

security, seen in tele-psych in the clinic area and returned to their housing units. The process went smoothly and without incident during the weekend of observation. The new psychiatric nurse is responsible for tracking this system. If a psychiatrist is on vacation or a lockdown occurs, the psychiatric nurse will see the patient and report to the psychiatrist to assure continued compliance with this provision. COVID – 19 did cause a delay in the past, due to quarantine status of inmates, however, currently there are no patients on quarantine status.

Tracking of medication changes will need to occur and be followed to obtain substantial compliance with this provision.

*HRRJ is partially compliant with this provision.*

81.    Psychotropic Medication Compliance - If a medication is refused, the procedure is a follow up visit by a QMHP and subsequent appointment with the psychiatrist as necessary would then be conducted, it was noted that this always occurs according to the Agreement. There is a specific mental health tracking system for compliance. The current Medication Administration Record System (MARS) does identify when a patient has refused a medication. The Mental Health Director currently reviews all refusals. There is a new Psychiatric Nurse who recently was hired. she has taken over the responsibility for tracking medication compliance. On-site review found that out of the ten (10) patients all were seen by a psychiatrist or nurse practitioner. Behavioral health log for Medication refusals started in June 2021

Formal tracking mechanism using the current system must continue to be followed. This will assure medication compliance.

*HRRJ is partially compliant with this provision.*

82. Anti-Psychotic Medication Use - There is an anti-psychotic medication registry. Complete review of the list shows that it is reviewed by the lead Psychiatrist every two weeks. Notes are sent to other provider staff on suggested changes to the medication regimen. This list is forwarded to the Monitor monthly for review. Tracking of changes suggested is in place. Due to the lower ADP, Psychiatrist hours are appropriate. Currently, most are seen in a tele psych format. Some are seen on site by the Psychiatric Nurse Practitioner (NP). Observation of the process on the weekends for tele psych showed a robust and well-oiled process.

Tracking of actions taken by the prescribing psychiatrist or nurse practitioner after review by the lead psychiatrist has been implemented. This allows for tracking of compliance with this provision.

*HRRJ is substantially compliant with this provision.*

83.    Medication Administration Records Audits - MARs audits were conducted in January and March of 2021. Audits should be conducted every 90 days. Results of the audits showed completeness and accuracy. However, there was not consistency with the audits being conducted every 90 days.

This was recently re-initiated. Every 90-day audits will need to be consistently completed to obtain substantial compliance with this provision.

*HRRJ is partially compliant with this provision.*

84.     Serious Mental Health Registry - The SMI registry has been created and is sent to the Monitor and USDOJ once a month with the monthly statistics. The data include, diagnosis, date of last QMHP/Psychiatrist visit, date of next visit.

   HRRJ will need to consistently follow up with this provision to assure completeness and accuracy of data provided.

   *HRRJ is substantially compliant with the provision.*

85.     Suicide Prevention - From observation and reviewed notes on charts and security records HRRJ is vigilant and proactive regarding suicidal potentials in the inmate population. There has not been a death by suicide at HRRJ since 2018. Suicide Prevention Signs are present for HRRJ to remind them of the potential warning signs of suicide.

   HRRJ will need to be substantially compliant with provisions 85 – 99 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with the suicide prevention component of the Agreement. No grade will be given at this time. Pending Review, PR*

86.     Suicide Prevention Training - Suicide prevention training curriculum was revised with input from the Monitor and includes all topics required in the Agreement. Suicide training is scheduled and has been conducted monthly over the past six (6) months. One hundred eighty-two (182) staff have been trained during suicide prevention training. New Employee Orientation (NEO) Training is also being conducted. Suicide Prevention Training is an eight (8) hour training. Once all HRRJ staff have been trained an annual 2-hour training will be initiated. A schedule is maintained by HRRJ training staff to assure all staff have the required training. Training is provided by Qualified professionals. CPR training is part of the New Employee Orientation (NEO) training curriculum. One NEO and two in-service annual trainings are conducted each month. Crisis Intervention Training (CIT) was re-initiated in August of 2021. CIT training was conducted in October 2021 and is scheduled for December 2021. Thirteen (13) staff have been trained in CIT. Twenty-five (25) in Mental health first aid.

   Continuation of CIT will be critical to assist all staff in working with challenging patients. Along with continuation of Suicide Prevention training monthly will allow this provision to move towards substantial compliance.

   *HRRJ is partially compliant with this provision.*

87.     Suicide Risk Assessment - Suicide risk assessments are being conducted using a comprehensive risk assessment tool. A challenge previously with the assessments is that they were not completed in a confidential setting. This has improved as most assessments are conducted in a confidential setting. The challenge is security staffing during weekends and holidays. It will be critical to continue to improve this process to assure it is held in a confidential setting.

   HRRJ will need to assure consistent provision of all suicide assessments in confidential settings

   *HRRJ is partially compliant with this provision.*

88.     Suicide Watch - Suicide watches have significantly improved over the past six months. Previously, inmates who were not on watch were housed next to those on watch. This created a challenge for the officer responsible for the watch as contraband was passed to an inmate on watch and caused self-injurious behavior. This has changed and only those on suicide watch are housed in the area. Review of "Inmate Watch Sheets" show that the officers on watch are providing 15-minute irregular checks. This is important to assure that an inmate does not keep track of when an officer may show up at the door to do a check. Additional training and changes to the "Inmate Watch Sheets" helped to make the process consistent. Observation by the Monitor on three occasions showed that the staff assigned to "watch" had no other duties. The Agreement states that "constant observation requires that a staff member have an unobstructed view of the prisoner at all times". The current cells provide an unobstructed view. HRRJ made this a priority and new cell doors with an unobstructed view were ordered and are now in place in all areas where suicide watches take place. This was critical for the officer to be able to always see the inmate, especially when on a constant watch. HRRJ administration worked on changing the doors on the cells. The HRRJ Board approved emergency funding to allow HRRJ to purchase doors quickly. A coordinated effort made this a reality.

    HRRJ made the physical plant changes to assure that inmates on watch are in cells with a "unobstructed" view of the inmate. HRRJ must assure that officers who are assigned watch duties have NO other assignments. HRRJ will need to assure that "15-minute checks" are done on an irregular basis and signed off by supervisory personnel to assure accuracy and consistency. Constant training must occur to assure compliance. All supervisory staff must be vigilant to assure that "watch" staff have no additional duties, especially on weekend and holidays.

    *HRRJ is partially compliant with this provision.*

89.     Suicidal Prisoner Housing - HRRJ is to provide suicide housing that is clinically appropriate with sight lines that permit the appropriate level of staff supervision. As noted above, the sight lines are now adequate for the task. It will take a continuous process to train all Security, Behavioral Health and Medical Staff, ensuring consistent treatment and housing of suicidal inmates. At the May meeting of the HRRJ Board the budget was approved which gave the authority to the Superintendent to proceed with changes to the suicide watch cells. They were installed in late September. All cells in this area are suicide resistant. The doors have Lexan gauge windows which allows for unobstructed sight lines from "watch" staff. It is hopeful that over the next six (6) months HRRJ should be able to move to substantial compliance with this provision, as all staff are trained to assure any suicidal inmate is housed according to policy and the Agreement.

    HRRJ must continue the training and supervision of all jail officers assigned to "watch". Doors are present which provide an unobstructed view with sight lines that permit the appropriate level of staff supervision.

    *HRRJ is partially compliant with this provision.*

90.     Suicidal Prisoner Treatment – HRRJ will ensure suicidal inmates receive access to adequate mental health treatment and follow up care.  Inmates placed on suicide watch are evaluated by a QMHP within the required twelve (12) hour or (sixteen (16) hours on weekends) time frame. Changes to procedure allow for confidential assessment of those inmates expressing suicidal ideation prior to placement on suicide watch. Documentation on the level of watch and conditions and precautions are

provided by the QMHP to security staff daily, after the in person visit. During on-site visits QMHP visits were observed for those on suicide watch. Observation on weekends show a QMHP is available seven (7) days a week providing the required assessment and interaction. The biggest challenge is to assure that the patient can be seen outside of their cell. Security staffing, especially on weekends, makes this extremely difficult and does not occur every time QMHP staff see an inmate on suicide watch. After an inmate has been discharged from suicide watch, QMHP's visit the inmate on a regular schedule, even more often than is required in the Agreement. Currently licensed MH staff see the patient twenty-four (24) hours after release from suicide watch, then three (3) days following, then five (5) days following, for a total of three (3) follow up visits within nine (9) days of removal from suicide watch. Over the current 6-month period nineteen (19) inmates who had been on suicide watch were observed by the Monitor being seen, assessed, and counseled by behavioral health staff. Both QMHP staff and the Mental Health Director take responsibility for seeing inmates who are in, or have been released, from suicide watch status. Review of treatment plans for those inmates have found that all plans were updated after being released from suicide watch.

HRRJ will need to assure that they strategize how to allow for out of cell activities over the next 6 months to be compliant with section "c" of this provision. HRRJ must work diligently to continue the process in place for assessment, placement, observation, treatment and follow up for those on suicide watch.

*HRRJ is partially compliant with this provision.*

91.     Psychiatric Hospitalization/Crisis services - As noted in #64 and #77 above - Temporary Detention Orders (TDO) are being utilized.  Since January 2021 all TDO's submitted for action have been approved. Nineteen (19) in total for 2021. The rate of acceptance for TDO's in 2020 was Ninety-Two percent (92%). This shows that HRRJ mental health staff are assessing and evaluating the need for a TDO appropriately and correctly using that process to the advantage of inmates.

Continued review of the appropriateness of submissions for initiation of TDO process will require vigilance by the Mental Health Director and QMHP staff.

*HRRJ is substantially compliant with this provision.*

92.     Mental Health Achievement Awards (MHAA) - HRRJ behavioral health staff are initiating awards. They have procedures and criteria developed. When COVID - 19 allows for more group and additional individual therapy, and when recruitment efforts are successful in hiring additional staff, this will be fully implemented. They continue to provide Behavioral Management and Treatment Plans for patients at HRRJ. Review of incentives provided through Behavioral Management Plans is a process for providing "Achievements" to mental health clients. Sixteen (16) patients received MHAA over the time period May – October 2021.

HRRJ must continue to expand this process to be compliant with this provision.

*HRRJ is partially compliant with this provision.*

93. Mental Health Release Planning – HRRJ will provide release planning for inmates with a serious mental illness.

HRRJ will need to be substantially compliant with provisions #93 – #97 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with the mental health release planning component of the Agreement. No grade will be given at this time. Pending Review, PR*

94.     Release Plan - Grant funded programs are in place. Community Oriented Re-Entry Program (CORE) grant and Forensic Discharge Planning Programs through local Community Services Board (CSB) address this provision. During this period, grant staff completed one hundred forty-nine (149) mental health screenings using the Brief Jail Mental Health Survey and received fifty-five (55) referrals, thirty-nine (39) were program eligible. Contracted staff provided programming for three (3) programs; Thinking for Change, Seeking Safety and Peer POD hour. Inmates received sixty (60) hours of individual counseling and forty-four (44) hours of group counseling. While HRRJ is not directly responsible for the grants, they are the key player in helping to make release planning a reality for those being transitioned from HRRJ custody. Twenty-five (25) SMI inmates were released with a specific release plan. The release plans contained all the required areas from the Agreement, some clients provide the information and contacts to follow through on the plans and some do not. The plans are sound, but clients can choose not to use part, or all of the plans as is their right. There are times when a plan may not have all the areas as an inmate may not give all information. This is especially true in the area of family/community/social supports. A challenge is that the CSB must send the final release plan to HRRJ if the patient is released directly from Court. That does not always happen. Another challenge is that some SMI patients refuse to meet or cooperate with the local CSB. In one instance release planning had arranged housing for an inmate. HRRJ provided transportation on release for the inmate to the behavioral health community housing unit. The patient was dropped off at the unit, after the HRRJ staff left it was reported by staff at the behavioral health facility that the patient walked away and did not enter the building.

It will be incumbent on the HRRJ staff to continuously reach out to assure that the referrals for inmates are in place to assist those SMI inmates being released. It will be critical for the grant and forensic staff to track those SMI released inmates for HRRJ to meet the requirements of the Agreement.

*HRRJ is partially compliant with this provision.*

95.     Warm hand-off – Enriched communication with the grant and CSB staff has allowed for more coordination of services and a warm hand off to community mental health providers. COVID – 19 is still a barrier to both HRRJ, CSB and grant staff. During this time period, May – October, twenty-three (23) individuals had a warm hand off to a CSB.

It will be critical that the grant staff and local CSB provide needed information and tracking to HRRJ for them to be able to obtain substantial compliance with this provision.

*HRRJ is partially compliant with this provision.*

96.     State Prisons Notification -. The process for medical and mental health records acceptance is fairly rigorous, requiring the faxing of relevant data, including COVID - 19 information to the receiving

facility at least 24 hours in advance of the transfer. All information was transmitted to each receiving facility and inmates are transferred without incident.

*It will be important for HRRJ to diligently track all transfers to State Prison custody to stay substantially compliant with this provision.*

*HRRJ is substantially compliant with this provision.*

97.     Discharge Medications and Renewals - The contractor for healthcare services at HRRJ, Wellpath, has collaborated with InMed to ensure a total of a fourteen (14) day supply of medications. The process is for any remaining medications which are available on the pill pack are provided to the inmate upon release. If there is not a 14-day supply available to the inmate, then a prescription is faxed to the nearest pharmacy to the address the inmate will be residing for the balance of the 14-day required supply. There were twenty-nine (29) inmates released for time served, bond produced or released by the Court. Five (5) of those had an SMI diagnosis and five (5) were on psychotropic medications. Each were given the medications on hand and an InMed order was generated. In August there was a special needs patient who needed specific meds. The HRRJ mental health staff worked with the pharmacy and the patient to assure they received necessary continuity of medications.

*HRRJ and Wellpath will need to be diligent and track all discharge medications to assure continued substantial compliance with this provision.*

*HRRJ is substantially compliant with this provision.*

98.     Collaboration between Mental Health, Security Staff, and Jail Leadership - A weekly Institutional Classification Committee (ICC) meeting is held to discuss all inmates who may be in any type of RH. The format of the ICC was changed in January 2021. The new format which includes discussion of inmates with SMI diagnosis who are in a RH unit greater than twenty-one (21) days duration or approaching thirty (30) days. Discussion also includes inmates with MH issues that are housed in the RH unit. Medical Advisory Committee (MAC) meetings are also used to convey relevant information on SMI and special needs inmates. As noted in previous section in this report, communication is something that has significantly improved over this first year of the Agreement. Change in administration at HRRJ has shown a commitment for accomplishing the requirements of the Agreement.

*HRRJ will need to continue building on this momentum of improvement to move toward substantial compliance with this provision.*

*HRRJ is partially compliant with this provision.*

99.     Mental Health Training for Security Staff - Revised training, including lesson plans using a PowerPoint presentation are implemented. All lesson plans have the required components of the Agreement. Training for security staff conducted starting in April 2021 using this revised curriculum. An addition to the curriculum is a 2-hour role play scenario. For many adult learners, this strategy is extremely helpful to compliment lecture and PowerPoint types of presentations. De-escalation training has yet to begin, however, with improved communications between and among staff examples are emerging of de-escalation. It was noted, in the past when there was a potential issue with inmates security would use OC spray (Oleoresin capsicum or "pepper spray) to contain the situation. At each

ICC meeting any inmate with an SMI diagnosis where OC spray was used is discussed. In six (6) months there were seven (7) instances. It is noted that the use of OC spray on any inmate has significantly decreased, and staff are using alternative methods to de-escalate situations where OC spray or use-of-force may have been used. Not all situations will resolve in such a manner, but it was noted that the improved communication among the entire HRRJ staff has resulted in more coordination and cooperation between and among staff. HRRJ will need to develop and provide specific de-escalation training to become substantially compliant with this provision.

De-escalation and MH Awareness training will begin when QMHP staffing improves. Suicide prevention training is occurring, one hundred eighty-two (182) staff have been trained in 2021. Suicide prevention training outlines the DOJ criteria for emergent, urgent, and routine referrals to MH staff.

HRRJ will need to continue mental health training and begin de-escalation training to obtain substantial compliance with this provision.

*HRRJ is partially compliant with this provision.*

## Housing For Prisoners With Serious Mental Illness

Housing for prisoners with SMI will be provided in general population, mental health units, secure mental health units, and acute mental health units as outlined below.

HRRJ will need to be substantially compliant with provisions #100 – #104 to obtain substantial compliance with this overall provision.

100.    Housing for Prisoners with SMI – HRRJ had one (1) year from effective date of the Agreement to meet these provisions. Currently those patients diagnosed with SMI are housed in an Acute MH Unit. There are plans to create a gender specific acute and secure SMI units respectively. And also gender specific Transition and Recovery Units (TRU) and gender specific Mental Health GP units. Specifics for these units are outlined in the Restrictive Housing Plan and Implementation Plan Addendum. HRRJ plans to move forward with opening one unit at a time. Plans are in place to open the first unit in 2022. This is contingent on the hiring of staff for the unit. As of the writing of this report, the unit is not open.

While this Monitor is encouraged by the desire to meet the obligations of the Agreement, I caution HRRJ to make sure that they don't forget the security and safety of the institution. Neither HRRJ or the United States could have anticipated the occurrences over the past year, and neither party should push the institution into a corner that may cause a negative outcome. COVID- 19 and the fallout from the restrictions that have had to be put in place, and the new labor situation has caused serious problems with recruiting and retention of security and healthcare staff. Again, this is a marathon, not a sprint.

*HRRJ will need to be substantially compliant with provisions 100 – 104 to obtain substantial compliance with this overall provision. No grade will be given at this time pending review, PR.*

101.    Policies and Procedures for Mental Health Units - HRRJ has produced a draft policy which is undergoing review. As they have developed and submitted the proposed policy and asked for comments

a rating of partial compliance will be given. The policy will need to be fully reviewed and discussed prior to full approval by the Monitor and the United States.

<u>HRRJ is partially compliant with this provision</u>

102.    Mental Health Units - Challenges noted are the current and future staffing needs, including additional psychiatry hours, RN vacancies, officer vacancies, and the need for development of a treatment team. Space for meetings with inmates and the treatment team is also a concern that will need to be addressed. A general outline called the Restrictive Housing Plan and the Implementation Plan Addendum has been developed. As noted in #100 above, HRRJ is anticipating opening one of the units in 2022. If this occurs this provision will move to partially compliant. However, again as noted in #100 above, HRRJ must be acutely aware of the security situation at the jail to assure safety and security of the institution, its staff, contractors, and inmates. A plan for dedicated mental health programming must be available for inmates housed in the unit(s).

<u>HRRJ is non-compliant with this provision</u>

103.    Secure Mental Health Units – HRRJ has developed a Restrictive Housing Plan/Implementation Plan Addendum that identifies this unit. The draft policy describes the inmates who would be assigned to the unit and the programming to be ongoing. Challenges to implementation are security and healthcare staffing to allow for the structured activities outlined in the Agreement. Physical plant changes have begun to occur and more will be needed to assure the safety and security of the residents of these units, jail, and healthcare staff. This unit is not set to open soon.

<u>HRRJ is non-compliant with this provision</u>

104.    Acute Mental Health Unit – HRRJ anticipates opening this unit in 2022. All twenty-six (26) Lexan line-of-sight doors have been hung. Again, the challenge will be security and healthcare staffing. Recruitment of mental health staff continues to be a significant barrier to fully implement this provision. The Agreement requirement of four (4) hours of clinically appropriate out-of-cell time will be nearly impossible to obtain with the current mental health staffing. To be partially compliant a plan must be provided that identifies the clinically appropriate activities and timelines for QMHP staff to be present to observe and conduct such activities.

<u>HRRJ is non-compliant with this provision</u>


**Restrictive Housing**

HRRJ must assure that the use of RH for those with SMI comport with the Constitution and the Americans with Disabilities Act.

105.    Restrictive Housing on Prisoners with Serious Mental Illness - As noted in #98 above all RH placements are reviewed during the ICC. Those with a SMI diagnosis are reviewed and diverted to another housing unit if possible. An institutional HRRJ policy was developed to address the new revised process. HRRJ security and healthcare staff have worked hard to move toward compliance. HRRJ has made significant steps in removing inmates out of RH areas. It will take a concerted effort by all staff at HRRJ to stay compliant with these provisions.

HRRJ will need to be substantially compliant with provisions #105 – #116 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with restrictive component of the Agreement. No grade will be given at this time. Pending Review, PR.*

106.    Not used as alternative to Mental health care and treatment - HRRJ has worked hard to assure that RH is not used as an alternative to mental health treatment. HRRJ policies have been approved and are being implemented to assure HR is not used as an alternative to mental health treatment. As noted in the first monitor report all persons in Protective Custody (PC) are no longer housed in the RH unit. The ICC process has significantly improved. This process started in January of this year, security and healthcare staff have worked well together to make this a reality. The Monitor or security consultant attend each ICC meeting in person or via Zoom. The United States attends when available. The population of those in RH for over twenty-one days continues to be much lower than in previous reports. The statistics for November 3, 2021 showed fourteen (14) inmates who had been in RH for more than twenty - one (21) days. Of those, only four (4) had an SMI diagnosis. As noted previously and to be compliant with #111 – 114, HRRJ creates memos which are reviewed at the ICC meeting and signed off by the Superintendent and MH Director if an inmate with an SMI is in RH for more than thirty (30) days.

HRRJ and healthcare staff are to be commended for the continued commitment to make this a reality. While not complete, they will need to continue to address this issue to avoid negative consequences for those with SMI who may be placed in RH.

All HRRJ staff must be committed to assuring that no inmate with an SMI diagnosis is placed in RH as an alternative to adequate mental health care and treatment. The ICC meeting process needs to evolve with greater flexibility and ability for robust conversation.

*HRRJ is partially compliant with this provision.*

107.    Screening of all on mental health caseload in 24 hours after placement in restrictive housing – All inmates placed in RH are assessed in the first 24 hours. Currently, a MH assessment for Restrictive Housing Unit form has been implemented to identify any contradictions for RH placement for inmates with a SMI diagnosis. The form continues to be submitted to hearings on grievances SMI patients which continues to result in most instances dismissal of disciplinary infractions. On site and zoom attendance by the monitor and/or security consultant at the ICC meeting is showing excellent discussion regarding inmates who are in RH and what is the best strategy to use for the inmate and the institution. A challenge to full implementation is the inconsistent notification of a change in inmate status to mental health staff in a timely manner, and staff vacancy. Specific tracking of this element is currently underway.

Continued vigilance will be required to move this provision from partial to substantial compliance. A formal tracking mechanism will also be required.

*HRRJ is partially compliant with this provision.*

108.    Referral assessment for deteriorating condition - The behavioral health staff are currently conducting weekly rounds in RH units. Those with and SMI diagnosis are being seen more frequently, at least twice a week according to fifty (50) SMI charts reviewed. All inmates who are identified as decompensating are seen with increasing frequency, referred for a psychiatric evaluation and or follow up. If necessary, a TDO is initiated. QMHP staff have been vigilant in following up with all inmates identified with a SMI diagnosis. There are times on weekends when a patient is not taken out of their cell to be seen.

QMHP staff must continue to make this a priority especially for those with the potential for decompensation. Identification of those with potential decomposition should be noted so QMHP staff assigned to rounds in the RH unit are aware of the potential for that to occur.

*HRRJ is partially compliant with this provision.*

109.    Documentation of placement/removal from restrictive housing - HRRJ currently tracks all placements and removals from RH through documentation. Documentation is sent to the monitor, security consultant and the United States on a weekly basis and reviewed during on-site visits.

HRRJ security must work to finalize the policy related to this provision.

*HRRJ is partially compliant with this provision.*

110.    SMI inmates in restrictive housing have same standards as General Population (GP) - Currently those inmates in the RH unit receive the same food service as the GP. RH unit inmates are given showers three days per week. Clinical and professional visits are allowed for those in RH units. COVID - 19 has caused delays in some visits. Access to reading and writing materials is provided, as clinically indicated, and evaluated especially for those who may have a potential for self-directed violence behavior. The institution is currently working on installing TV monitors in the RH unit.

HRRJ will need to follow up to make sure they are consistent with all areas in this provision to obtain substantial compliance.

*HRRJ is partially compliant with this provision.*

111.    No inmate with SMI will be placed in restrictive housing on administrative restriction status absent Extraordinary Circumstances which are approved with documented reasons by the Superintendent and Director of Mental Health– In May 2021, Mental Health Department created memos outlining date of placement in RHU, behavior while in RHU resulting in additional disciplinary infractions and recommendation to stay or remove from RHU. These memos are generated by the Mental Health Director or designee for initial thirty (30) day review and are subsequently updated every week they remain in RHU. These patients are also discussed weekly ICC meetings to brainstorm alternative placement options, creative problem solving, to identify antecedents to maladaptive behaviors and a clear pathway to transition out of RHU.

HRRJ will need to continue tracking any SMI inmates' administrative restriction status and address that issue with the Superintendent and Mental Health Director as soon as identified.

*HRRJ is partially compliant with this provision.*

112.    Weekly approval by Superintendent and MH Director if SMI placed on administrative restriction in restrictive housing - A written process and forms required to be signed by the Superintendent and Mental Health Director are in use. These are used to provide proof of review by the Superintendent and Mental Health Director. HRRJ is developing policies and procedures to memorialize the current practice utilizing these forms.

HRRJ has adopted these forms and processes. It will be important to track and assure that the policy is written and followed, once approved.

*HRRJ is substantially compliant with this provision.*

113     SMI in restrictive housing administrative restriction moved to mental health unit or reviewed – Security Policy and Procedure is being developed. Specific locations for Acute MH Unit and Secure MH Unit have been identified. Challenges include security and MH vacancies, workspaces for dedicated MH staffing, and programming for each MH unit.

*HRRJ is non-compliant with this provision*

114.    If inmate not removed from restrictive housing must be documented including reason - Wellpath, the healthcare services contractor has developed a policy to address this provision. A form has been created outlining recommendation to divert an inmate diagnosed with an SMI from RH. The form is being used and has helped to divert SMI inmates from RH. Also, during the ICC meeting any staff who feel an SMI inmate should not be removed from RH must give a reason, and a suggestion as to strategies to help the inmate to move from RH unit. The challenge for complete implementation continues to be policy development, staff to implement the policy, an identified diversion unit and alternative disciplinary sanctions or strategies to implement alternatives to disciplinary action.

Full implementation will be necessary to move from partial to substantial compliance. Policy development by security needs to be a priority.

*HRRJ is partially compliant with this provision.*

115.    If inmate is not removed from RH, then HRRJ must have a heightened level of care for those in RH- All patients with a SMI diagnosis have an increased level of care after which includes once daily visit from an RN if on medications, face-to-face, therapeutic, out-of-cell session with a QMHP once a week, rounds three (3) times a week by QMHP, one of which is conduced out of cell. There currently is no specific diversion unit. Currently, QMHP staff will conducts additional rounds in RH unit, if clinically indicated. Mental health rounds are not being used as treatment. As noted previously there are times when the out-of-cell session has not occurred. The Superintendent has made it clear to staff that all due diligence must be used to try and allow for out of cell sessions.

HRRJ and Wellpath need to continue to work assuring that all areas of this provision are implemented. Additional face-to-face out-of-cell counseling sessions, QMHP rounds 3 x per week or more if necessary, and appropriate treatment as indicated. Continued tracking will be important for HRRJ to obtain substantial compliance with this provision.

*HRRJ is partially with this provision.*

116.    SMI inmates in restrictive housing for more than 30 days will be reviewed weekly and approved by Superintendent and MH Director - In May 2021, Mental Health Department created memos outlining date of placement in RHU, behavior while in RHU resulting in additional disciplinary infractions and recommendation to stay or remove from RHU. These memos are generated by Mental Health Director or designee for initial thirty (30) day review and subsequently every week they remain in a RHU. These patients are also discussed weekly ICC meetings to brainstorm alternative placement options, creative problem solving, to identify antecedents to maladaptive behaviors and a clear pathway to transition out of RHU. These memos are kept by MH Director and security places copy of memo in inmates' classification file. As of November 3, 2021 there were two (2) inmates with an SMI diagnosis who had been in RH for more than thirty (30) days.

<u>HRRJ will need to continue to evaluate the use of the form and track if it addresses the provision appropriately. HRRJ security needs to put operational procedure into policy identifying the appropriate use of the form.</u>

*HRRJ is partially compliant with this provision.*

117.    Restrictive Housing Placement Based on Disability – HRRJ must assure that inmates with mental health disabilities are not placed unnecessarily in RH based on their disability. Review of all relevant documents showed that there have been no persons placed on RH based on disability. Review of all documents and tracking will continue to confirm this status.

<u>HRRJ will need to continue to assure that all inmates are reviewed prior to placement in RH to assure that none with mental health disabilities are unnecessarily placed in RH.</u>

*HRRJ is partially compliant with this provision.*

118.    No inmates to be placed on restrictive housing due to "mental deficiencies" - There have been no inmates who have been placed on RH status based on "mental deficiencies". This term is no longer used at HRRJ.

<u>HRRJ will need to continue to assure that all inmates are reviewed prior to placement in RH to assure that none with mental health deficiencies are placed in RH.</u>

*HRRJ is substantially compliant with this provision.*

**Quality Assurance**

119.    Assure QA program is developed, implemented, and maintained, identifies and correct deficiencies –

<u>HRRJ will need to be substantially compliant with provisions 119 – 125 to obtain substantial compliance with this overall provision.</u>

*HRRJ must meet all the below criteria to become compliant with Quality Assurance Program component of the Agreement. No grade will be given at this time. Pending Review, PR.*

120.    QA policies will be developed in six (6) months – HRRJ and Wellpath, the healthcare vendor has produced policies related to Continuous Quality Improvement (CQI).

HRRJ must provide training on the updated policies to be consistent with current practice to obtain substantial compliance with this provision.

*HRRJ is partially compliant with this provision.*

121.    QA monthly mechanisms implemented in 3 months, including relevant data 1 - 29 - Relevant data related to the Agreement has been submitted monthly by the Agreement Coordinator, to the United States, and the Monitor. There have been no instances that HRRJ has been unwilling to provide the data, the challenge has been the format by which the data has been provided and obtaining all the relevant data in a form that is transmissible. Substantial provision 121 a. 25 is the data point that has been difficult to obtain. The systems required to obtain the information are not compatible, each are on different platforms from different sources. The United States has been working with HRRJ to see if there is any way they may be able to take the information available and merge it into one report. This has been a work-in-progress, but not yet resolved.

HRRJ must continue to provide relevant aggregate data in the 29 areas related to the implementation of the Agreement.

*HRRJ is partially compliant with this provision.*

122.    Quality Improvement Committee (QIC) developed and implemented in 3 months - The first meeting of the Quality Improvement Committee was held on May 7, 2021. QIC meetings have occurred monthly since. The monitor attends the meetings when on site or on zoom. Minutes of the meeting were reviewed and contained recommendations for changes to how data was collected and reported. Changes to descriptors related to the data will help with interpretation. An example would be those that are in quarantine are not in HR, however had been counted as such in the data, this has been corrected. This is the type of recommendation that will help HRRJ provide accurate data to the Monitor and the United States. Wellpath, the healthcare contractor has recently established QIC goals and processes.

HRRJ must continue to assure that the QIC meets monthly addressing all areas of the institution and Agreement, reviewing, and analyzing data, identifying trends and interventions, making recommendations for improvement and monitor implementation of recommendations.

*HRRJ is partially compliant with this provision.*

123.    Recommend and Implement changes to policies and procedures based on monthly assessment – As noted above, HRRJ held their first QIC meeting on May 7, 2021. Minutes note changes suggested for identifying self-directed violence, suicide training for staff, monthly staff vacancy report, achievement certificates, breakdown of administrative restrictions in the monthly aggregated data report submitted to

the Monitor and DOJ. There were also graphs created to identify where HRRJ is in the Agreement process to help track recommended changes. The graph is presented to the HRRJ Board to keep them abreast of the current status and movement toward substantial compliance.

The committee will need to vigorously track recommendations from the QIC committee, identify and implement any changes to policy and/or procedures based on the monthly meeting recommendations.

*HRRJ is partially compliant with this provision.*

124.     Monthly reports to monitor and USDOJ - HRRJ has complied with and sent all requested and required documents to the United States and to the Monitor. The challenge at times is tracking and in obtaining the data requested, as noted in #121 above.

HRRJ will need to continue to track changes to the monthly aggregated report to assure that changes are identified and resolved as quickly as possible.

*HRRJ is partially compliant with this provision.*

125.     Medical and mental health staff are included as part of the Continuous Quality Improvement (CQI) process - As noted in the meeting minutes and through direct observation, medical and mental health care staff are involved in the process as well as the monitor. As part of the Wellpath CQI process, HRRJ administration is acutely involved in the CQI process. Policy for the QA process needs to be finished and implemented to coincide with the current practice.

It will be important for medical and mental healthcare staff to continue to be part of the CQI process.

*HRRJ is partially compliant with this provision.*

126.     Morbidity-Mortality Reviews –

HRRJ will need to be substantially compliant with provisions 126 – 128 to obtain substantial compliance with this overall provision.

*HRRJ must meet all the below criteria to become compliant with morbidly-mortality reviews component of the Agreement. No grade will be given at this time. Pending Review, PR.*

127.     Morbidity and Mortality Review Committee and process –

The process has been conducted however the Monitor has suggested some improvements to the clinical and administrative review portions of the M and M process. There have been no deaths in the past 6-month review period so review of any changes to the process has not been possible at this time.

It is critical that both the clinical and administrative reviews are conducted to allow for a free flow of information during the review process

*HRRJ is partially compliant with this provision.*

128.   Ensure senior Jail staff have access to all reviews - HRRJ jail staff are involved and have attended the M and M reviews and have access to all materials.

   It is important that Wellpath provide the HRRJ senior management with recommendations in regard to any issues identified during the M and M process.

   *HRRJ is partially compliant with this provision.*

140.   Bi-annual Status Reports - Status reports have been provided. An initial report was sent to the monitor and the United States on October 7, 2021. A review on site with the monitor produced an updated report with monitor recommendations on October 25, 2021

   These reports will be required during the duration of the Agreement.

   *HRRJ is partially compliant with this provision, as it is an ongoing responsibility for HRRJ.*

142.   Monitor baselines site visit - The Monitor visited the facility on October 12 - 16, 2020 and again on October 21, 2020. This visit was in conjunction with a face-to-face meeting with the HRRJ Jail Board.

143.   Monitor baseline report - The Monitor Baseline report was provided to the Court on November 30, 2020.

144.   Every six (6) month report - The First Monitor Report was sent to the Court on May 28, 2021. As May 31, 2021, was federal holiday, the Court received the report on June 1, 2021. The Monitor has been on-site every month since October 2020. The Monitoring contract was signed on September 17, 2020. This report will be sent to the parties for review and comment and then submitted to the Court on November 30, 2021.

152.   Agreement Coordinator - Lt. Ponds, Agreement Coordinator, (Substantial Provision 152) has been forwarding the required Relevant aggregate data (Substantial Provision 121, a 1 - 29) to the Monitor and US DOJ monthly. While challenges with the formatting and access to the data have been present during the first six months, most of the data was available for review and follow-up while on-site.

   *HRRJ is substantially compliant with this provision.*

153.   Stakeholders - Multiple partners are working with the HRRJ to support efforts to provide continuing care to HRRJ inmates who are released. The Portsmouth CSB is presently working with the jail to provide assistance and continuity of care to inmates released from HRRJ. HRRJ is using the CORE grant available through the Portsmouth CSB to involve other feeder jails within their jurisdiction to provide services to inmates who are released from HRRJ.

   It will be important for HRRJ to continue to communicate better with the stakeholders to encourage their commitment.  This works to allow for better continuity of care for inmates within the walls of the institution and those released from the facility.

*HRRJ is partially compliant with this provision.*

154-5. Implementation Plan - HRRJ provided the first implementation plan on September 30, 2020. HRRJ submitted the next Implementation Plan on October 1, 2021, with staffing matrix additions on October 1 and 7, 2021. The United States sent comments and recommendations on the plan November 1, 2021. The implementation plan identified the parameters required under the Agreement.

<u>These reports will be required during the duration of the Agreement</u>.

*HRRJ is partially compliant with this provision, as it is an ongoing responsibility for HRRJ.*

156.    Comments on Annual Implementation Plan - the Monitor provided comments to the HRRJ implementation plan on site October 20, 2020

157.    Annual Implementation Plan - the next Implementation plan from HRRJ is to be submitted on September 30, 2022

## Inmate Interviews

Over the past 6 months the security consultant conducted inmate interviews.

## May - November Inmate Interviews

1.  Female    HRRJ - 4 years

Having a baby while incarcerated at HRRJ, she voiced that the Mental Health treatment has improved and has assisted her with her Mental Health needs.  She stated she has been receiving her medications as prescribed, but her Mental Health medications are changed often. Hostile towards Medical due to her sugar and blood pressure checks, but her Mental Health counselor has intervened to get vitals checked. Medical was contacted, and the inmate's sugar levels are normal and do not need them checked regularly.

2.  Male        HRRJ      - 6 years

The inmate has minimal contact with Medical or Mental Health, and he is on no medications.  He has received his COVID shot.  He states that Dental services are limited to only annual check-ups.  I asked him about emergency responses from security and medical, and what he has observed was adequate.

3.  Male        HRRJ - 3 years

He has been seen by medical when it is requested in a couple of days. He stated that he is receiving his medications as prescribed. He is seeing his psychiatrist every two weeks through tele-psych and is satisfied with his Mental Health treatment. He informed me that the Mental Health and Medical services have improved during his time at HRRJ.

4.  Male          HRRJ - 6 weeks

He entered the facility with a knot under his left eye and was seen by medical but states the eye doctor has not seen him. I checked this out with Medical, and he has been scheduled to be seen by an eye doctor. He was seen by Mental Health and prescribed medication. He has not been at HRRJ long enough to comment on any changes relative to Mental Health or Medical services.

5.  Male          HRRJ - 4 months

The inmate had numerous requests for additional changes due to his physical condition, requesting an extra mattress and padded chairs in the dayroom. He asked for a bland diet several months ago and is not getting the fruit he needs. These issues were checked out with Medical, and he was permitted to have an additional mattress which he has and assigned to a lower bunk. He was also prescribed a bland diet upon arrival at the Jail.

6.  Male          HRRJ - 2 years

In discussing his Mental Health needs, he stated that the Mental Health services have positively changed since he has been incarcerated. Concern was expressed about his diet since he has gained eighty pounds while incarcerated. He is receiving a Medical diet due to him being pre-diabetic. Due to some physical issues, he has requested four mattresses to help with his physical problem, and he has been authorized two mattresses. He is seeing a physical therapist regularly. Medical is aware of his weight gain. Medical monitors his commissary purchases to ensure he is not purchasing excessive items that may lead to his weight gain and diabetic issues. Due to his physical problems, he is unable to participate in any form of physical activity, which could help in his weight loss.

7.  Male          HRRJ - 6 months

He entered HRRJ with a wound and received chronic care treatment every two weeks upon arrival. He was positive about his medical treatment since being at HRRJ.

8.  Male          HRRJ - 32 months

When he entered HRRJ, he had numerous issues with his right leg and multiple surgeries. States he was not receiving the appropriate antibiotics; his medical records show that he has been receiving antibiotics. For a period, he was confined to the medical unit at HRRJ and had improved, allowing him

to be rehoused in protective custody. He complains to medical about his treatment, hoping to return to the medical unit. Medical states that he does not need the medical unit and only desires to return due to the medical beds with mattresses.

9.  Female      HRRJ - 30 days

The inmate was pregnant upon arrival at HRRJ and relates she has been receiving the appropriate prenatal care since arriving. She is receiving no prescription medication. She was previously seeing a counselor at CSB. Mental Health at HRRJ has contacted her counselor at the CSB and is talking to her regularly.

10. Female      HRRJ - 4 months

She had a broken foot when she arrived but has surgery scheduled for when she is released. She was favorable to the Medical treatment since her arrival. She has been referred to CSB upon release, and it is presently scheduled.

11. Female      HRRJ - 50 days

She had a miscarriage before arriving at HRRJ and feels she has received appropriate medical care since she arrived at HRRJ. States that she wants a regular diet; after checking her medical records, it is noted that she requested a vegetarian diet which is what she is receiving. Medical will request her diet change to a regular tray.

12. Female      HRRJ - 29 months

States that she has been getting her medication on time and consistently since her arrival. She expressed that she has no Mental Health issues but did express concern about the length of time that it took for Medical to arrive when she fell. She did state that she could not relate the exact time of the incident. No record of fall in the inmate record.

13. Female      HRRJ - 5 months

She received her Blood Pressure medication upon arrival and has continued to receive it as prescribed. While at HRRJ, she had a miscarriage and received adequate medical treatment. She expressed concern as to how an officer was treating the female inmates. This information was referred to security for further follow-up; the results of this investigation were not available upon my departure.

14. Male        HRRJ - 1 year

The inmate had multiple concerns relative to his diabetic condition. He stated that Medical was not checking his insulin regularly and was not receiving insulin before breakfast. In checking with Medical, the records reveal that initially, he was given his insulin at around 4:00 a/m regularly. At this time, Medical is not checking his sugar level daily because it is within normal parameters. He stated he saw the Doctor on October 23, relative to his ankle and, nothing has been discussed since that time. His Medical records reveal that he has been receiving physical therapy regularly for his ankle.

15. Male          HRRC - 3 years

This inmate has multiple medical issues and is in a wheelchair and receiving Mental Health Services. Throughout our meeting, he was very optimistic about his treatment from Medical and Mental Health services at the Jail. At the beginning of his stay at HRRJ, he had problems getting his medications on time and them not getting refilled on time. He states he has experienced a positive change in getting his medication on time in the last year.

**Appendix A**

## Summary of Compliance - Substantive Provisions

| Number | Policies and Procedures | Rating |
|--------|------------------------|--------|
| 19 | Consultation with Monitor, USDOJ on policy development | PC |
| 20 | Policies approved will be adopted | PC |
| 21 | Begin Implementing policies approved | PC |
| 22 | Fully implemented policies | PC |
| 23 | Annual policy review | NR |
| | | |
| **Number** | **Staffing Plan** | **Rating** |
| 24 | Staffing plan development | PC |
| 25 | Staffing Plan Implementation | PC |
| | | |
| **Number** | **Training** | **Rating** |
| 26 | Annual in-service training | PC |
| 27 | Incorporate Agreement requirements into the training curriculum | PC |

## Summary of Compliance - Substantive Provisions

| 28 | In-service training | PC |
|---|---|---|
| 29 | Training on mental health care | PC |
| | | |
| **Number** | **Security** | **Rating** |
| 30 | Security Staffing | PC |
| | | |
| **Number** | **Medical and Mental Health Care** | **Rating** |
| 31 | Medical and Mental Health Prior Records | SC |
| 32 | Feeder Jail medical records | SC |
| 33 | Continue Medications | SC |
| 34 | Medical or Mental Health Request/Sick Call Process | PC |
| 35 | Sick Call Collection | PC |
| 36 | Sick Call Triage | PC |
| 37 | Sick Call Tracking | PC |
| 38 | Sick Call Oversight | PC |
| | | |
| **Number** | **Medical Care** | **Rating** |
| 39 | Constitutionally adequate medical care | PR |
| 40 | Medical Staffing | PC |
| 41 | Medical Intake | SC |
| 42 | Medical screening factors | SC |
| 43 | Medical Assessments | PR |
| 44 | Emergent Medical Assessments | PC |
| 45 | Urgent Medical Assessments | PC |
| 46 | Routine Medical Assessments (Intake) | PC |

## Summary of Compliance - Substantive Provisions

| 47 | Routine Medical Assessments (Sick Call) | PC |
|---|---|---|
| 48 | Acute Care | PC |
| 49 | Chronic care | PC |
| 50 | Chronic Care Registry | PC |
| 51 | Chronic Care Plan of Care | PC |
| 52 | Chronic Care Protocol | PC |
| 53 | Medical Diagnosis | SC |
| 54 | Medical Specialist Appointments | PR |
| 55 | Medical Specialist Registry | SC |
| 56 | Medical Follow-up care | PC |
| 57 | Medical Treatment Plans | SC |
| 58 | Medical Treatment | PC |
| | | |
| **Number** | **Mental Health Care** | **Rating** |
| 59 | **HRRJ is to provide constitutionally adequate mental health care** | **PR** |
| 60 | Mental Health Staffing | PC |
| 61 | Mental Health Intake | SC |
| 62 | Mental Health Screening Factors | SC |
| 63 | Mental Health Assessments | SC |
| 64 | Emergent Mental Health Assessments | SC |
| 65 | Urgent Mental Health Assessments | PC |
| 66 | Routine Mental Health Assessments (Intake) | SC |
| 67 | 14-Day Mental Health Check-in | PC |
| 68 | Routine Mental Health Assessments (Sick Call) | PC |
| 69 | Nature of Mental Health Assessment | PC |
| 70 | Mental Health Treatment Plans | PR |

HRRJ SECOND REPORT NOVEMBER 30, 2021

## Summary of Compliance - Substantive Provisions

| 71 | Timing for initial treatment plan | SC |
|----|-----------------------------------|----|
| 72 | Multidisciplinary team treatment plan update | PC |
| 73 | Requirements for treatment plan | PC |
| 74 | Timing for Treatment plan review | SC |
| 75 | Mental Health Treatment | PR |
| 76 | Mental Health Therapy | PC |
| 77 | Mental Health Inpatient Care | SC |
| 78 | Confidential Mental Health Treatment | PC |
| 79 | Psychotropic Medications | PC |
| 80 | Psychotropic Medication follow-up | PC |
| 81 | Psychotropic Medication Compliance | PC |
| 82 | Anti-Psychotic Medication Use | SC |
| 83 | Medication Administration Records Audits | PC |
| 84 | Serious Mental Health Registry | SC |
| 85 | Suicide Prevention | PR |
| 86 | Suicide Prevention Training | PC |
| 87 | Suicide Risk Assessment | PC |
| 88 | Suicide Watch | PC |
| 89 | Suicidal Prisoner Housing | PC |
| 90 | Suicidal Prisoner Treatment | PC |
| 91 | Psychiatric Hospitalization/Crisis services | SC |
| 92 | Mental Health Achievement Awards | PC |
| 93 | Mental Health Release Planning | PR |
| 94 | Release Plan | PC |
| 95 | Warm hand-off | PC |
| 96 | State Prisons Notification | SC |

HRRJ SECOND REPORT NOVEMBER 30, 2021

## Summary of Compliance - Substantive Provisions

| 97 | Discharge Medications and Renewals | SC |
|---|---|---|
| 98 | Collaboration Mental Health, Security Staff, and Jail Leadership | PC |
| 99 | Mental Health Training for Security Staff | PC |
| | | |
| **Number** | **Housing For Prisoners With Serious Mental Illness** | **Rating** |
| 100 | Housing for Prisoners with SMI | PR |
| 101 | Policies and Procedures for Mental Health Units | PC |
| 102 | Mental Health Units | NC |
| 103 | Secure Mental Health Units | NC |
| 104 | Acute Mental Health Unit | NC |
| | | |
| **Number** | **Restrictive Housing** | **Rating** |
| 105 | Restrictive Housing on Prisoners with Serious Mental Illness | PR |
| 106 | Not used as alternative to Mental health care and treatment | PC |
| 107 | Screening of all on mental health caseload in 24 hours after placement in restrictive housing | PC |
| 108 | Referral assessment for deteriorating condition | PC |
| 109 | Documentation of placement/removal from restrictive housing | PC |
| 110 | SMI inmates in restrictive housing have same standards a GP | PC |
| 111 | No placement for SMI unless Extraordinary Circumstances | PC |
| 112 | Weekly approval by Superintendent and MH Director if SMI placed on administrative restriction in restrictive housing | SC |
| 113 | SMI in restrictive housing administrative restriction moved to mental health unit or reviewed | NC |
| 114 | If inmate not removed from restrictive housing reason documented including reasons | PC |
| 115 | If inmate not removed have heightened level of care | PC |
| 116 | SMI inmates for more than 30 days will be reviewed weekly and approved by Superintendent and MH Director | PC |

HRRJ SECOND REPORT NOVEMBER 30, 2021

## Summary of Compliance - Substantive Provisions

| 117 | Restrictive Housing Placement Based on Disability | PC |
|---|---|---|
| 118 | No inmates to be placed on restrictive housing due to "mental deficiencies" | SC |
| | | |
| **Number** | **Quality Assurance** | **Rating** |
| 119 | Assure QA program is developed, implemented and maintained, identifies and correct deficiencies | PR |
| 120 | QA policies will be developed in six (6) months | PC |
| 121 | QA monthly mechanisms implemented in 3 months, including relevant data | PC |
| 122 | Quality Improvement Committee (QIC) developed and implemented in 3 months | PC |
| 123 | Recommend and Implement changes to policies and procedures based on monthly assessment | PC |
| 124 | Monthly reports to monitor and USDOJ | PC |
| 125 | Medical and mental health staff are included as part of the Continuous Quality Improvement (CQI) process | PC |
| | | |
| **Number** | **Morbidity-Mortality** | **Rating** |
| 126 | Morbidity-Mortality Reviews | PR |
| 127 | Morbidity and Mortality Review Committee and process | PC |
| 128 | Ensure senior Jail staff have access to all reviews | PC |
| | | |
| **Number** | **Monitoring Activities** | **Rating** |
| 140 | Bi-annual Status Reports to Monitor | PC |
| 142 | Monitor baselines site visit | Completed |
| 143 | Monitor baseline report | Completed |
| 144 | Every six (6) month report | Ongoing |
| | | |

## Summary of Compliance - Substantive Provisions

| Number | Implementation | Rating |
|---|---|---|
| 152 | Agreement Coordinator | SC |
| 153 | Stakeholders | PC |
| 154-155 | Implementation Plan | PC |
| 156 | Monitor Comments on Annual Implementation Plan | Completed |
| 157 | Annual Implementation Plan | Ongoing |
| | | |

–End–